A–T–O, INC., Plaintiff,

v.

PENSION BENEFIT GUARANTY
CORPORATION, Defendant.

No. C76–605.

United States District Court,
N. D. Ohio, E. D.

Feb. 14, 1978.

Richard Cusick, Frederick W. Assini, Thomas A. Jorgensen, Thomas A. Cicarella, Calfee, Halter & Griswold, Cleveland, Ohio, for plaintiff.

Christine O. Cook, Henry Rose, Pension Benefit Guaranty Corp., Christine C. Nettesheim, Washington, D. C., and William Kloepfer, Associate Regional Sol., Dept. of Labor, Cleveland, Ohio, for defendant.

MEMORANDUM AND ORDER

WILLIAM K. THOMAS, District Judge.

Plaintiff, A–T–O, Inc., filed this declaratory and injunctive action on June 18, 1976,

against the defendant Pension Benefit Guaranty Corporation (PBGC). In its amended complaint filed October 27, 1976, A–T–O alleges, *inter alia*, that certain sections of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* (1974) (ERISA)—hereinafter all section references are to Title 29 unless specified otherwise—in Title IV of that act, "Plan Termination Insurance," 29 U.S.C. § 1301, *et seq.*,[1] are unconstitutional both as written and as applied to plaintiff.[2] A–T–O further alleges that it is not subject to the provisions of Title IV which impose upon it a liability for the amount by which a pension fund which it terminated was unfunded.[3] Finally, A–T–O charges that PBGC abused its discretion in denying A–T–O's application for a waiver from the liability so imposed. Upon PBGC's denial of A–T–O's application for waiver of liability, A–T–O sought relief in this court.

As alleged, this court has jurisdiction under Title 29 U.S.C. § 1303(f) (ERISA), and Title 28 U.S.C. § 1331 (federal question jurisdiction), and the several claims are amenable to declaratory relief pursuant to Title 28 U.S.C. §§ 2201 and 2202.

On March 15, 1977, PBGC's motions to dismiss the complaint and the amended complaint were overruled and ordered to be treated as a motion for summary judgment. PBGC moves on the grounds that: (1) Title IV of ERISA providing for employer liability upon termination is applicable to A–T–O; (2) the denial of the waiver was within agency discretion; and (3) the imposition of liability is constitutionally permissible.

A–T–O's motion for summary judgment is based on the grounds that: (1) the plan falls into a statutory exception to Title IV coverage by virtue of being "an individual account plan" or "a defined contribution plan;" (2) the unfunded portion of the pension trust is not subject to being guaranteed by PBGC because the plan benefits are "forfeitable;" and (3) PBGC's denial of a waiver for A–T–O was arbitrary and capricious.

The court has considered the opposing motions for summary judgment upon the complaint as amended, the administrative record of PBGC, affidavits, and extensive briefs. The facts as stated are not in dispute unless otherwise indicated.

I.

Plaintiff A–T–O terminated the Springfield Pension Plan (the Plan) that covered the employees in the United Steelworkers bargaining unit at one of its divisions, the Springfield Metallic Casket Co. (Springfield). The Plan was terminated pursuant to A–T–O's decision to cease operations at Springfield. It is agreed that the decision to shutdown the plant was for legitimate business reasons—made prior to and without intent to avoid ERISA.

Prior to becoming a division of A–T–O, Springfield entered into the Plan with the United Steelworkers of America and its local Union No. 1713 (the Union) as part of a collective bargaining agreement executed on April 1, 1965. Certain provisions of the Plan are written with reference to the April 1, 1964 "Basic Agreement" and any successor agreement between the parties. The Plan provides "service credits" to Union members for employment with Springfield prior to the Plan's effective date.

Springfield became a division of Mid-Con, Inc. subsequent to the formation of the pension trust; and on October 29, 1969, Mid-Con, Inc. was merged into A–T–O. A–

1. Codified as Subchapter III in Title 29.

2. Plaintiff requests that a three-judge court be convened pursuant to Title 28 U.S.C. §§ 2282 and 2284 to determine the constitutionality of section 1362 and for injunctive relief against the enforcement of 29 U.S.C. § 1362 (authorizing the PBGC to impose employer liability), section 1367 (recovery of employer liability for plan termination) and section 1368 (lien for liability of employer).

3. Basically, the "unfunded" amount is the difference between the funds actually held by the trustees of the pension fund and the present worth of the amounts which are required to meet all the commitments of the pension plan in full, assuming that its provisions do not otherwise negate the obligation to fulfill those commitments.

T–O assumed Springfield's obligations under the Plan as of that date and contributed to the Plan at the maximum rate allowed by Title 26, The Internal Revenue Code—a rate in excess of that required by the Plan.

**4. PENSION PLAN AGREEMENT**

*SECTION 1—Definitions* . . .
*SECTION 2—Effective Dates* . . .
*SECTION 3—Determination of Continuous Service* . . .

3.2 Continuous Service [a number used in calculating pension benefits] shall be broken for purposes of this Agreement by:

(e) termination of employment due to permanent shutdown of a plant, department or subdivision thereof; . . .

*SECTION 4—Normal Retirement*

4.1 Any Employee who, at the time of his retirement from employment shall have at least fifteen (15) years continuous service and shall have attained the age of sixty-five (65) years may retire from the active employment of the Company and shall be eligible to receive a normal pension.

4.2 The monthly amount of any normal pension granted under paragraph 4.1 shall be one dollar and sixty-five ($1.65), multiplied by the Employee's continuous service determined in accordance with the provisions of Section 3, not in excess of thirty (30) years.

*SECTION 5—Early Retirement* . . .
*SECTION 6—Total and Permanent Disability*
. . .

[Requirements of disability omitted.]

6.4 The monthly amount of any disability pension granted under paragraphs 6.1 and 6.3 shall until the attainment of age sixty-five (65) be the greater of:

(a) One hundred dollars ($100) less any benefits under Title II of the Social Security Act, to which the Employee is, or upon application would become, entitled or

(b) An amount of pension computed under the provisions of paragraph 4.2 but based only on continuous service to the date of retirement for disability.

Upon such Employee's attainment of age sixty-five (65) his disability pension shall cease and he shall be entitled to receive only the amount of pension computed under the provisions of paragraph 4.2 hereof. . . .

*SECTION 7—Deferred Vested Retirement*
. . .

*SECTION 8—Payment of Pensions* . . .

8.4 In the event that during the continuance of the Agreement the balance in the Pension Trust shall be insufficient to pay benefits to any pensioner or to any applicant for a pension, payments shall be made in the order of date of application for retirement.

*SECTION 9—Administration and Appeals Procedure.* . . .

The Plan has been amended from time to time by changes to both the basic agreement and the Plan. Those provisions of the Plan, hereafter discussed, are set forth in the margin.[4]

*SECTION 10—Pension Trust.* . . .

10.2 The Company contributions to the Pension Trust shall be determined and limited by the provisions of Section 15 of the Basic Agreement. The Company shall be obligated to contribute into the Pension Trust the following amounts:

(a) two ($.02) cents per hour for each hour worked by every Employee as herein defined from April 1, 1964 through March 31, 1965.

(b) nine ($.09) cents per hour for each hour worked by every Employee as herein defined from April 1, 1965 through March 31, 1968.

It is the intention of the Company and the Union that the contributions made hereunder are for the purpose of funding future service credits as earned and amortizing on a level funding basis over a period of approximately thirty years the liabilities attributable to past service as of the effective date of the Pension Trust.

10.3 The Company may make payments to the Pension Trust in addition to those required pursuant to paragraph 10.2. Such additional payments may, in the discretion of the Company, be credited against the payments the Company is required hereunder to make.

10.4 Payments made in accordance with this Section 10 shall be in complete discharge of the Company's financial obligation under this Agreement. The Pension benefits of this Agreement shall be only such as can be provided by the assets of the Pension Trust and there shall be no further liability or obligation on the Company to make any further contributions to the Pension Trust for any reasons.

. . . . .

*SECTION 11—Termination of Plan*

11.1 In the event of termination of this Pension Plan Agreement, the funds in the Pension Trust shall be allocated, to the extent that they shall be sufficient, to pay pension benefits as provided under this Agreement to Employees and retired Employees . . . [order of priority of groups omitted]. . . .

If the amount of the assets in the Pension Trust applicable to groups (a), (b) or (c) above, is insufficient to provide full benefits for all Employees or retired Employees in any such group, the allocation with respect to such Employees shall be made by reducing the retirement benefits proportionately for the first such group for which full benefits cannot be provided. . . .

*SECTION 12—General Provisions*

12.1 No pension properly payable pursuant to the Pension Agreement shall be discontinued

Springfield was closed on November 28, 1974 after ERISA had become effective on September 2, 1974. Two days after the closing—November 30, 1974—the Plan was terminated. At termination the trust funds resulting from employer contributions and the proceeds from the investment thereof totalled $117,845. The Plan's actuary estimated that as of that date the unfunded portion amounted to $193,169.

Upon receipt of A–T–O's application, PBGC adopted a resolution waiving section 1362 liability for A–T–O pending review of the application; however, by letter of May 19, 1976, PBGC notified A–T–O that it would hold A–T–O liable for the amount of the unfunded portion.

## II.

A–T–O falls within the defined coverage of section 1321(a) as a pension benefit plan maintained by an employer engaged in commerce or as a plan qualified under the Internal Revenue Code. Title 26, U.S.C. § 401. Notwithstanding, A–T–O argues that it is not subject to Title IV, "Plan Termination Insurance, first, because it comes within the exception to coverage of section 1321(b) which states:

(b) This section does not apply to any plan,

(1) which is an individual account plan, as defined in paragraph (34) of section 1002 of this title.

Section 1002(34) provides:

(34) The term "individual account plan" or "defined contribution plan" means a pension plan which provides for an individual account for each participant and *for benefits based solely upon the amount contributed to the participant's account,* and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account. [Emphasis added.]

Relying on the emphasized phrase, A–T–O contends that the Springfield Plan provides "for benefits based solely upon the amount contributed to the participant's account." It reasons that since section 10.4 of the Plan limits A–T–O's liability to the amounts set forth in section 10.2, and since under section 11.1 obligations of the Plan can be satisfied only out of the pension fund's assets, it follows that the "benefits [are] based solely upon" the employer's contribution to the petitioner's account. A projection of the Plan's future operation had it not been terminated dispels any facial plausibility of this contention.

Assuming continuation of the Plan and a continuing stream of persons becoming eligible for benefits, it is apparent that benefits receivable by a pensioner could exceed the amounts contributed by A–T–O on his behalf. By way of example, either a long-lived normal pensioner under section 4 or a disability pensioner under section 6 could continue to draw a monthly pension after the total of disbursements to such a pensioner exceeded the contributions made on his behalf by the employer—there is no provision in the Plan that limits the benefits that may be paid to any individual participant that accrued as a result of his employment. Conversely, in the case of a

or reduced during the life of any pensioner except as provided in paragraph 6.3 [disability pension continues only as long as disabled] or 6.4 or 11.1 hereof.
SECTION 13—Persons Bound. . . .
SECTION 14—Cost of Administration. . .
SECTION 15—Duration of Agreement. . .

*AMENDMENT TO PENSION PLAN AGREEMENT*
[Section 4.2 amended to read:]
4.2 The monthly amount of any normal pension granted under paragraph 4.1 shall be:
(a) one dollar and sixty-five cents ($1.65) for months of retirement on or after April 1, 1965 but prior to April 1, 1968,

(b) one dollar and eighty-five cents ($1.85) for months of retirement on or after April 1, 1968 but prior to April 1, 1969,
(c) two dollars ($2.00) for months of retirement on or after April 1, 1969 but prior to April 1, 1970,
(d) two dollars and twenty-five cents ($2.25) for months of retirement on or after April 1, 1970 but prior to April 1, 1971, or
(e) two dollars and fifty cents ($2.50) for months of retirement on or after April 1, 1971, multiplied, in each instance, by the Employee's continuous service determined in accordance with the provisions of Section 3, not in excess of thirty (30) years.

pension trust that is not fully funded, the persons qualifying for pensions after the payment of benefits to the hypothetical pensioners above may find that the previous payments to others have depleted the pension trust's coffers and dissipated the contributions made to the trust by the employer on behalf of this late-coming pensioner. The late-comer would find that the Springfield Plan provides *no protection to him* against the disbursement of "his individual account" to others.

■ Thus it becomes evident that the Springfield Plan is not an "individual account" under section 1321(b), and therefore it is not exempt from Title IV of ERISA. Section 1321(b) is meant to exempt those plans that are so contractually structured as to assure that the contributions made on behalf of an employee reach that employee (subject only to gain or loss as the result of the economic fate of the trust fund).[5]

### III.

While not claiming that it is excepted by section 1362(a),[6] A–T–O insists that section 1362(b) does not subject it to any possible liability. A–T–O points to section 1362(b) as follows:

**5.** A–T–O has cited *Connolly v. PBGC,* 419 F.Supp. 737 (C.D.Cal.1976), in support of the contention that the Springfield Plan is within section 1002(34).

In the plan examined in *Connolly, supra,* the amount of a monthly pension was determined by multiplying "Prior Service Credits and Pension Credits" by a "Pension Factor." The Pension Factor was to be fixed from time to time by the trustees taking "into account the investment income *gains and losses,* expenses, any forfeitures by participants" of the plan. *Id.* at 740.

In contrast to the plan in *Connolly,* under both the original section 4.2 of the Springfield Plan, and its amendment, the amount due to a Springfield pensioner does not fluctuate dependent upon the fund's "investment income, gains and losses [etc.]," but rather is determined upon the product of the pensioner's "Continuous Service" times a fixed dollar amount.

Since the definition of an "individual account plan" in section 1002(34) requires that a plan must provide benefits "based solely upon . . . contribut[ions] . . . income . . . [and] . . . gains and losses . . .," the

(b) Any employer . . . shall be liable . . . in an amount equal to . . .

(1) the excess of—

(A) the current value of the plan's benefits <u>guaranteed under this subchapter</u> on the date of termination over

(B) the current value of the plan's assets . . . [Emphasis as urged by A–T–O.]

The "subchapter" is "Plan Termination Insurance" consisting of sections 1301 through 1381. Section 1322, "Benefits Guaranteed" provides:

(a) Subject to the limitations contained in subsection (b) of this section, <u>the corporation shall guarantee the payment of all nonforfeitable benefits</u> (other than benefits becoming nonforfeitable solely on account of the termination of a plan) under the terms of a plan which terminates at a time when section 1321 of this title applies to it. [Emphasis added.]

From this underlined language springs the question of whether the plan provided "nonforfeitable benefits." Subchapter III, Title IV of ERISA including section 1322, does not define "nonforfeitable." ERISA, however, in Title I, Subchapter I, "Protection of Employee Benefit Rights" includes

Springfield Plan does not fall within the definition of an "individual account plan" as does the plan, as it was read, in *Connolly, supra.* Hence, *Connolly* is neither analogous nor controlling here.

**6.** Title 29, § 1362 provides:

(a) This section applies to any employer who maintained a plan (other than a multiemployer plan) at the time it was terminated, but does not apply—

\* \* \* \* \* \*

(b) Any employer to which this section applies shall be liable to the corporation, in an amount equal to the lesser of—

(1) the excess of—

(A) the current value of the plan's benefits guaranteed under this subchapter on the date of termination over

(B) the current value of the plan's assets allocable to such benefits on the date of termination, or

(2) 30 percent of the net worth of the employer determined as of a day, chosen by the corporation but not more than 120 days prior to the date of termination, computed without regard to any liability under this section.

section 1002, a multi-definitional section. Section 1002(19)[7] keys nonforfeitability to "a claim . . . which is unconditional, and which is legally enforceable against the plan."

A–T–O argues that 1002(19) defines the term "nonforfeitable benefits" in section 1322. Disagreeing, PBGC contends that for the purposes of Subchapter III (including 1322) the applicable definition of nonforfeitable is the one PBGC itself promulgated for "Determination of Nonforfeitable Benefits." Appearing in 29 C.F.R. § 2605.6 (1976), PBGC's definition of nonforfeitability unilaterally depends upon the participant's satisfaction of "all of the conditions required of him under the provisions of the plan to establish entitlement to the benefit."[8] In applying section 1002(19), A–T–O says that the Springfield Plan benefits are forfeitable within section 1002(19) by virtue of section 15 of the Basic Agreement:

> The amount of Pension Benefits will be determined by what the company contributions will provide on an actuarially sound basis level of benefits to be negotiated by the union and the company.

Further, sections 10.4 and 11.1 of Pension Plan Agreement more specifically provide that the employer's obligations cease upon payment of the required contributions and that benefits shall be only such as can be provided by the assets of the Pension Trust. A–T–O thus caps its argument: since the benefits are strictly limited to the trust's assets, there is no amount subject to being guaranteed by PBGC because the only benefits "legally enforceable against the plan," section 1002(19), are those which are satisfiable through the plan's available assets. Of course, if PBGC's own regulatory definition applies, A–T–O's argument falls.

Thus the question becomes whether PBGC's regulatory definition of nonforfeitable overrides the statutory definition of "nonforfeitable" in section 1002(19). The inception of the regulatory definition, first published September 22, 1975, in Vol. 40 of the Federal Register at 43,510, casts doubt on its applicability since the date post-dates the Plan termination date of November 30, 1974. In contrast, section 1002(19) became effective on September 2, 1974 with the enactment of ERISA, thus prior to the Plan termination date of November 30, 1974.

Nevertheless, PBGC argues that this court should defer to its regulatory definition on the authority of *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1968). In determining whether to adopt the construction of a statute by the FCC, the court in *Red Lion* relied upon the,

> . . . venerable principle that the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong . . . .

*Id.* at 381, 89 S.Ct. at 1802. The principle of *Red Lion* must be applied consistently with the mandate of *Weinberger v. Hynson, Westcott & Dunning*, 412 U.S. 609, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1972):

> It is well established that our task in interpreting separate provisions of a single Act is to give the Act "the most harmonious, comprehensive meaning possible" in light of the legislative policy and purpose. *Clark v. Uebersee Finanz-*

---

7. For purposes of this subchapter:

(19) The term "nonforfeitable" when used with respect to a pension benefit or right means a claim obtained by a participant or his beneficiary to that part of an immediate or deferred benefit under a pension plan which arises from the participant's service, which is unconditional, and which is legally enforceable against the plan. For purposes of this paragraph, a right to an accrued benefit derived from employer contributions shall not be treated as forfeitable merely because the plan contains a provision described in section 1053(a)(3) of this title.

8. Title 29 C.F.R. § 2605.6 provides:

(a) For the purposes of this part, a benefit payable with respect to a participant is considered to be nonforfeitable, if on the date of termination of the plan the participant has satisfied all of the conditions required of him under the provisions of the plan to establish entitlement to the benefit, except the submission of a formal application, retirement, or the completion of a required waiting period.

(b) For the purposes of this part, benefits that become nonforfeitable solely as a result of the termination of a plan will be considered forfeitable.

*Korp., supra,* 332 U.S. [480], at 488, 68 S.Ct. [174], at 178 [92 L.Ed. 88]; see *United States v. Bacto-Unidisk* 394 U.S. 784, 798, 89 S.Ct. 1410, 418, 1418, 22 L.Ed.2d 726.

*Id.* at 631–632, 93 S.Ct. at 2484. As seen, there is marked deviation between the participant protection of PBGC's definition of nonforfeitable and the "unconditional . . . legally enforceable" claim requirement in the section 1002(19) nonforfeitable definition. While PBGC urges that the Springfield Plan is nonforfeitable under section 1002,[9] it chiefly casts its plumper for the applicability of its own regulatory definition of "nonforfeitable." It seeks to justify

**9.** PBGC has argued that even if the definition of section 1002(19) is applicable here, that IRC Reg. § 1.411(a)–4, "Forfeitures, suspensions, etc.," 42 Fed.Reg. 42,326, No. 163, Aug. 23, 1977, precludes finding any Springfield benefits as being forfeitable under section 1002(19).

At the threshold, Reg. § 1.411(a)–4 is not applicable to the Springfield Plan because IRC Reg. 1.411(a)–2(b) provides that the regulations are applicable to plan years starting after Dec. 31, 1975 for plans in existence as of Jan. 1, 1974. Nevertheless, consideration is given to PBGC's argument since the regulation does address the subject matter of nonforfeitability.

PBGC originally argued this point with the support of Temporary Regulation § 1.411(a)–4, 40 Fed.Reg. 51,452, No. 214, Nov. 5, 1975, which was issued in conjunction with a rule-making proposed by the Secretary of the Treasury; it provided:

. . . Rights which are conditioned upon a sufficiency of plan assets in the event of a termination or partial termination are *not* considered to be forfeitable. [Emphasis added.]

However, the quoted language did not survive the ensuing rule-making process intact.

The final Reg. § 1.411(a)–4 deleted the word "not," a change this court deems significant. The pertinent parts of the permanent regulation read:

. . . For purposes of section 411 [of the Internal Revenue Code] and the regulations thereunder, a right to an accrued benefit is considered to be nonforfeitable at a particular time if, at that time and thereafter, it is an unconditional right. . . .

[I] . . . Rights which are conditioned upon a sufficiency of plan assets in the event of a termination or partial termination are considered to be forfeitable because of such condition.

[II] . . . However, a plan does not violate the nonforfeitability requirements merely because in the event of a termination an employee does not have any recourse toward satisfaction of his nonforfeitable benefits from other than the plan assets or the Pension Benefit Guaranty Corporation.

Thus, under the permanent regulation, A–T–O argues that the language of "I" supports the "forfeitable" nature of the instant plan benefits, while PBGC argues that the plan's provisions throw it within the language of "II"— mandating "nonforfeitability."

As previously noted, section 15 of the collectively-bargained "Basic Agreement" provides:

The *amount* of Pension Benefits will be determined by what the company contributions will provide. . . . [Emphasis added.]

Section 10.4 of the Pension Plan Agreement provides:

The Pension *benefits* of this Agreement *shall be only* such *as* can be *provided by the assets of the Pension Trust.* [Emphasis added.]

Section 11.1 of the Pension Plan Agreement provides that upon termination of the Plan:

If the amount of the assets . . . is insufficient to provide full benefits . . . allocation . . . shall be made *by reducing the retirement benefits.* . . . [Emphasis added.]

Clearly, the language of these sections conditions the *amount* of the pension benefits upon a sufficiency of assets, and thus the provisions fall within "I" of section 1.411(a)–4. The above provisions do not speak in terms of limiting the *satisfaction* of a right to an undiminished pension benefit to the available assets, and therefore, the provisions do not fall within "II" of section 1.411(a)–4. Thus, even assuming that regulation section 1.411(a)–4 is applicable here, its application results in the conclusion that the benefits of the Springfield Plan that are in excess of the Plan's assets are forfeitable under section 1002(19).

PBGC has attached a letter from Ira Cohen, Director, Actuarial Division of the Internal Revenue Service, to the PBGC of October 6, 1977. Mr. Cohen wrote:

In a letter dated September 29, 1977 you requested our opinion as to whether the inclusion of either of two specific provisions in a pension plan would render the benefits described in the plan forfeitable under section 411 of the Internal Revenue Code and section 1.411(a)–(4) of the Income Tax Regulations.

The two provisions considered by Mr. Cohen are § 10.4 of the Springfield Plan and, in part:

. . . Benefits provided for herein shall be only such benefits as can be provided by the assets of the Fund. In the event of termination of this Plan, there shall be no liability or obligation on the part of the Company to make any further contributions to the Trustee except such contributions, if any, as on the effective date of such termination, may then be accrued but unpaid.

it by reference to its reading of Congressional intent. It says:

> . . . Any other construction of ERISA would be contrary to the plain intent of Congress. Congress intended to insure all vested benefits in covered plans, even those benefits subject to divestiture for insufficient funding. Indeed, limitation-of-liability provisions, common in most plans, were one of the major reasons Congress enacted the plan termination insurance program in Title IV of ERISA. [Cites to legislative history omitted.]

In section 1001, Congress did express concern with the provisions of pre-ERISA plans that PBGC characterizes as "limitation-of-liability provisions." Congress's findings are set forth in the margin.[10] The Senate Report, No. 93–127, indicates that Congress was concerned that employers were not then required by law "to make payments towards the *principal* of the unfunded accrued liabilities." (See n. 11 for full citation.) The vesting and funding provisions of Title I became effective for plan years beginning after December 31, 1975 for plans in existence January 1, 1974. Though vesting does result in nonforfeitability after that effective date, the PBGC's argument sweeps too widely when applied to plan liabilities accruing prior to enactment of ERISA.

The legislative history indicates that the act's purpose was to eliminate "limitation-of-liability" provisions prospectively, not retrospectively.

Indeed, Congress's expressed concern over the effects of the provisions of pre-ERISA plans is an acknowledgement of their contractual effectiveness to define the amount of vested benefits as equal to the pension plan's assets.[11] Early legislative

---

Mr. Cohen's analysis of section 1.411(a)–4 agrees with the above discussion, to wit:

> The first statement [I] from the regulations indicates that if a plan provision reduces the amount of an employee's benefit based on the amount of fund assets available, such benefit is forfeitable for purposes of . . . section 411. . . .
>
> The second statement [II] permits a plan provision which does not reduce the amount of an employee's benefit but which limits the employee's recourse toward satisfaction of that benefit to the assets available under the plan. The regulation states that such a limitation will not make an employee's right forfeitable for purposes of section 411 of the Code.

However, Mr. Cohen concludes that the Springfield Plan "read in context, does not reduce an employee's benefit, but merely limits his/her recourse toward satisfaction of the benefit." This court cannot agree with such an interpretation which flies in the face of the plain language of the Plan and the Basic Agreement.

**10.** Title 29, U.S.C. § 1001. "Congressional findings and declaration of policy" provides:

> (a) The Congress finds that the growth in size, scope, and numbers of employee benefit plans in recent years has been rapid and substantial; . . . that owing to the inadequacy of current minimum standards, the soundness and stability of plans with respect to adequate funds to pay promised benefits may be endangered; that owing to the termination of plans before requisite funds have been accumulated, employees and their beneficiaries have been deprived of anticipated benefits; and that it is therefore desirable in the interests of employees and their beneficiaries, for the protection of the revenue of the United States, and to provide for the free flow of commerce, that minimum standards be provided assuring the equitable character of such plans and their financial soundness.
>
> (b) [Omitted.]
>
> (c) It is hereby further declared to be the policy of this Act to protect interstate commerce, the Federal taxing power, and the interests of participants in private pension plans and their beneficiaries by improving the equitable character and the soundness of such plans by requiring them to vest the accrued benefits of employees with significant periods of service, to meet minimum standards of funding, and by requiring plan termination insurance.

**11.** Senate Report (Labor and Public Welfare Committee) No. 93–127, Apr. 18, 1973 [accompy. S.4] reprinted in Vol. 3 *U.S.Code Cong. & Admin.News* [1974] at p. 4838, provides at pp. 4845–6:

> *Funding*
>
> Another major issue in private pension plans relates to the adequacy of plan funding. "Funding" refers to the accumulation of sufficient assets in a pension plan to assure the availability of funds for payment of benefits due to the employees as such obligations arise. Today, funding of pension plans for the limited and specific purpose of qualifying for tax benefits permitted by law for contributions made is governed by statutory and regulatory requirements which are under the jurisdiction of the Internal Revenue Service (I.R.S. Code of 1954, Sections 401–404). The

history recognized that the employer's liability to a plan was the result of *quid pro quo* negotiation, and that the effective dates of ERISA were to be adjusted to allow plans to adjust to the new requirements of the act.[12] No such period of adjustment would be accorded to pension plans if the definition of 29 C.F.R. § 2605.-6(a) (1976) were applied here because that definition does not accommodate the negotiated limitation-of-vested-benefits-to-available-assets provision of the Plan.

The House Conference Report No. 93–1280, August 12, 1974,[13] indicates that the conference substitute provided for insurance coverage for "vested retirement benefits guaranteed by the plan." *Id.* at 5147–48. The quoted language clearly distinguishes between benefits that are "vested"

and those that are "guaranteed by [the provisions of the pre-ERISA pension plan agreement]," because the obvious converse of the quoted language is that benefits could be vested without being guaranteed by the pension plan. A fair reading of the Congressional intent in the noted insurance coverage discussion is that upon the prospective imposition of the minimum vesting and funding provisions of Title I, the benefits guaranteed under Title IV would automatically be elevated to the same levels as provided in Title I; however, insurance coverage for benefits accrued prior to the enactment of ERISA would be determined by the provisions of the individual pension plan.

Congress was aware of the distinction between "vested" and "nonforfeitable," and

---

minimum funding rules (Treasury Regulations, Sections 1.401–404(c) (1963)) require an employer to make contributions to a pension fund, qualified by the Internal Revenue Service, of amounts at least equal to the pension liabilities being created currently, and the interest due upon those amounts of monies which reflect unfunded accrued liabilities. The inherent weakness of this required minimum funding is that the employer is not required under law to make payments toward the *principal* of the unfunded accrued liabilities. Without mandatory funding of past service liabilities, a pension plan may never be in financial posture to meet its pension obligations to its employees.

**12.** Senate Report, No. 93–127, *supra*, provides at p. 4872:

### EFFECTIVE DATES

In order to provide sufficient time for pension and profit-sharing retirement plans to adjust to the new vesting and funding standards, to make provision for additional costs which may be experienced, and to permit negotiated agreements to transpire, the Committee has provided a three-year delayed effective date for compliance with the vesting and funding standards. Since the portability program is voluntary, it is believed that a one-year delayed effective date is sufficient to permit the Secretary to set in motion the administrative apparatus appropriate for this program. In order to assure as expeditiously as possible, termination insurance coverage for unfunded vested liabilities incurred prior to enactment, a one-year delayed effective date is provided for plans to obtain termination insurance pursuant to the provisions of Title IV. All other provisions are to become effective upon enactment.

**13.** House Conference Report, No. 93–1280, Aug. 12, 1974 [accompy. H.R.2] reprinted in Vol. 3 *U.S.Code Cong. & Admin.News* [1974] at p. 5038, provides at p. 5147–8:

*Benefits guaranteed*
The House bill would provide coverage for benefits required to be vested under the bill's minimum vesting standards (up to the insurance limitations) if the plan providing the benefit had been covered for more than five years prior to the termination. The corporation could elect to cover (subject to certain conditions) nonbasic benefits if both the plans providing them and the plan provisions providing the particular benefits had been in existence for more than five years prior to the termination, or if the plans providing the coverage were tax-qualified. The Senate amendment provided coverage for benefits vested under the plan up to the insurance limitations and without regard to whether they exceeded the vesting required under the bill. The benefits, however, had to have been provided by plan provisions in effect at least three years prior to the termination.

Under the conference substitute, vested retirement benefits guaranteed by the plan (other than benefits vesting only because of the termination) are to be covered to the extent of the insurance limitations except to the extent indicated below. (Nonbasic benefits the corporation had chosen to guarantee are also to be covered. These nonbasic benefits may include that part of annuities in excess of $750 monthly, medical benefits, etc. This coverage is not necessarily to be subject to the phase-in rule limiting coverage of basic retirement benefits.)

that distinction was to be obliterated upon the vesting and funding sections of Title I becoming effective in the first plan year after December 31, 1975. The application here of the PBGC regulatory definition would eliminate that distinction retrospectively—a result that the legislative history does not support. Indeed, choosing the PBGC regulation as the controlling definition would add double retrospectivity since, as seen, A–T–O's Plan was terminated on November 30, 1974 and the regulation was not adopted until September 22, 1975.

The judicial deference that the court in *Red Lion* afforded to the FCC's statutory interpretation was based in part upon Congress's ratification of the agency's construction through legislation subsequent to original act, see also *FHA v. The Darlington, Inc.*, 358 U.S. 84, 90, 79 S.Ct. 141, 3 L.Ed.2d 132 (1958). *Red Lion* gave further weight to the FCC's "[t]hirty years of consistent administrative construction left undisturbed by Congress . . . ." *Red Lion* 395 U.S. at 382, 89 S.Ct. at 1802. In the instant case, Congress has not adopted the definition of 29 C.F.R. § 2605.6, and the PBGC has not yet had time to build a reputation for expertise—having only been created on September 2, 1974. See *PBGC v. Tenn-Ero Corp.* and *PBGC v. Ouimet Corporation*, Bkr. Nos. 75–1520–HL, 75–1521–HL, and No. 76–1314–T (Massa. May 13, 1977) printed in BNA Pension Reporter, May 23, 1977, No. 138 (D–3) at p. (D–6) (memorandum of Bankruptcy Judge and Special Master).

The clear Congressional intent to make vesting and nonforfeitable equivalent terms on a prospective basis only, together with the mandate of *Weinberger, supra,* to interpret an act consistently, leads this court to hold that the definition of nonforfeitable under section 1002(19) applies to Title IV as well as to Title I of ERISA.[14]

Since, as noted above, section 15 of the collectively bargained "Basic Agreement," and sections 10 and 11 of the Pension Plan Agreement establish as a matter of law that benefits were conditioned upon a sufficiency of funds in the pension trust and that benefits are legally enforceable against the Plan only to the extent of the assets, any benefits under the Springfield Plan that cannot be satisfied out of the assets as of November 30, 1974, are forfeitable and hence not subject to being guaranteed under Title IV, § 1322(a). Since the benefits over and above the Plan assets are not nonforfeitable under section 1002(19), a calculation of employer liability under section 1362(b)(1) results in zero liability on the part of A–T–O. It is so determined.

## IV.

Even if this court were to accept PBGC's argument that the benefits of the Springfield Plan in excess of its assets were nonforfeitable and thus subject to the provisions of Title IV, that would not of itself

---

**14.** In support of the same conclusion, A–T–O has cited *Nachman Corp. v. PBGC*, No. 76–C–2963 (N.D.Ill. March 24, 1977) printed in BNA Pension Reporter, April 18, 1977, No. 133 (D–1), appeal docketed, Nos. 77–2146 and 2147 (7th Cir. Nov. 17, 1977). The plan in *Nachman* provided that benefits were limited to such as could be provided by the assets of the fund. The plan was terminated within 270 days of the enactment of ERISA and prior to January 1, 1976 so that Title I was not there applicable. See Title 29 U.S.C. § 1061(b)(2).

*Nachman* faced the question of whether the definition of Title I, § 1002(19), was applicable to Title IV, "Plan Termination Insurance." Though it is not apparent from the *Nachman* opinion whether the PBGC urged the regulatory definition of "nonforfeitable" upon the court, the court there held:

Though we recognize that this definition [of nonforfeitable in section 1002(19)] is contained in and limited to Title I of the Act, the PBGC has not presented any persuasive reasons for not assuming a similar usage of the term "nonforfeitable" in Title IV of the Act, § 4022(a), 29 U.S.C. § 1322(a). Rather, as urged by Nachman, the term "nonforfeitable" appears to be used in Title IV just as it is used in Title I. We therefore hold that since the vesting provisions of ERISA were not applicable to Nachman's Pension Plan, the benefits which became vested pursuant to the Pension Plan alone were *not* nonforfeitable, and therefore not subject to guarantee by PBGC under § 4022(a) of the Act, 29 U.S.C. § 1322(a).

establish a liability upon the part of A–T–O for the unfunded portion of the trust under section 1362. Section 1304(f)(4) allows [15] PBGC to waive or reduce any liability of an employer upon a showing that such a waiver "is necessary to avoid unreasonable hardship in any case in which the employer was not able, as a practical matter, to continue the plan." A–T–O argues that the denial of its application for a waiver was unlawful under Title 5, U.S.C. § 706(2)(A) as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

This court does not review the agency's decision de novo. The record available for this court's review is the record that was before PBGC at the time of its decision to deny the waiver. *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973).

PBGC agrees with A–T–O that its decision to close Springfield was made for legitimate business purposes, and that this decision was made prior to and without reference to the enactment of ERISA.

PBGC has not disputed that A–T–O did in fact contribute to the pension trust at a rate in excess of that required by the collectively-bargained agreement and did not seek credit against its required payments for these excess contributions as it could under the terms of the Plan. The SEC Form 10–K, a part of the administrative record, states "The Company's policy is to fund the maximum allowable under the Internal Revenue Code."

The Springfield Plan, the product of collective bargaining, funded the benefits that accrued from employee service during the life of the Plan. The unfunded liability of the Plan resulted from the granting of past service credits to Springfield employees at the commencement of the Plan for their prior employment with Springfield. In section 10.2 of the Plan, the parties recognized the creation of an unfunded liability:

> It is the intention of the Company and the Union that the contributions made hereunder are for the purpose of funding future service credits as earned and amortizing on a level funding basis over a period of approximately thirty years the liabilities attributable to past service as of the effective date of the Pension Trust.[16]

In fact, the unfunded portion was amortized over ten years prior to termination. Section 11 of the Plan which provides the priorities for an allocation of the pension fund's assets upon termination is an acknowledgement by both parties of the risk that termination might precede full funding. The Union's acceptance of this risk is reflected in a conversation by a PBGC employee with the Union representative. A PBGC memorandum [17] of June 13, 1975 states:

**15.** Title 29, U.S.C. § 1304(f) provides:

(f) In addition to its other powers under this subchapter, for only the first 270 days after September 2, 1974 the corporation may—

. . . . .

(4) waive the application of the provisions of sections 1362, 1363, and 1364 of this title to, or reduce the liability imposed under such sections on, any employer with respect to a plan terminating during that 270 day period if the corporation determines that such waiver or reduction is necessary to avoid unreasonable hardship in any case in which the employer was not able, as a practical matter, to continue the plan.

**16.** Had the Springfield Plan continued in operation until the provisions of Title I became applicable to it, section 1082(b)(2)(B)(i) would set the time period over which the employer would have to amortize the unfunded liability. Under that section, the Plan would have had to amortize the deficiency over a forty-year period. Actually, the Plan provided for amortization over a thirty-year period—a funding rate in excess of that which would be required by Title I.

**17.** PBGC by letter of July 13, 1977 to A–T–O states that despite the fact that this memo was referred to in the case record:

These documents are not related to the waiver question, were not part of the record before the agency on the waiver issue, and therefore are neither a part of the administrative record nor within your request for production of documents.

The court rejects this argument but notes that the letter indicates that the PBGC did not consider the facts that were before it.

I called Schwartz, the district rep for the United Steelworkers, and informed him that I was the Case Officer handling the termination of the Springfield Metallic Casket Company Pension Plan. All questions should be referred to me.

He said this contract was negotiated on the local level and his interpretation of SEC 10 of the Plan was that A–T–O had no liability.

In its supplementary letter of August 22, 1975, in support of its application for waiver, A–T–O contended:

The imposition of employer contingent liability of any magnitude, large or small, upon A–T–O is unreasonable because it imposes a financial obligation beyond the negotiated contributions. It impairs A–T–O's agreement with the Steelworkers and penalizes A–T–O for having delayed the closing of Springfield beyond September 2, 1974 in an effort to rehabilitate or sell Springfield.

Further in its supplementary letter of August 22, 1975, A–T–O argued that its diversification should not be held against it:

It is unreasonable to measure the magnitude of the financial liability against the assets of all of A–T–O's divisions.

None of these divisions had any control over or connection with Springfield. Springfield operated as a totally separate unit. It is not fair to burden the employees and managements of other divisions of A–T–O with the cost of providing pensions to employees of a casket company with which they had no other connection than having a common owner. Thus, the true measure of the financial magnitude of the imposition of employer liability is the net proceeds of the liquidation of Springfield compared with the value of its assets January 1, 1972.

A–T–O's 10–K for 1974 indicates a net income that steadily advanced from $7,499,-000 in 1970 to $11,193,000 in 1974. The current assets of A–T–O as of December 31, 1974 are listed as $309,462,000.

PBGC denied the waiver petition by letter to A–T–O of May 19, 1976.[18] PBGC has argued here that the denial was not violative of Title 5, U.S.C. § 706(2)(A):

In determining whether an agency has abused its discretion where the decision letter contains a "contemporaneous explanation of the agency decision" indicating "the determinative reason for the final action taken," the agency's action must stand or fall on the propriety of

18. We have considered the Petition for Waiver of A–T–O, Inc. ("A–T–O"), dated May 30, 1975, as supplemented by your letter of December [August] 22, 1975.

.   .   .   .

A–T–O has submitted information to the PBGC to provide confirmation that imposition for 1974. Arguments raised include the fact that the decision to close Springfield Metallic Casket Co., Inc. ("Springfield"), arose prior to the enactment of the Act; that the Springfield Metallic Casket Co., Inc. Pension Plan (the "Plan") itself provided for cessation of employer liability when the Plan was terminated; and that A–T–O asserted that the unfunded liability was primarily due to the advanced age of the workers and the substantial unfunded liability at the time A–T–O acquired the plant. A–T–O also contended that the imposition of employer liability amounts to a retroactive impairment of contract by Congress.

We recognize that the decision to close Springfield was for a legitimate business purpose, i. e., to avoid continuing losses, and that imposing employer liability on A–T–O will add to those losses. But we believe that these circumstances do not make a waiver necessary to avoid [meet] the "unreasonable hardship" which Congress contemplated in Section 4004 (f)(4), since the circumstances you describe are not unusual upon termination of a plan. We believe that for the hardship to be "unreasonable" something more must be shown. For instance, we have granted a waiver where the employer demonstrated that he would be unable to continue in business due to imposition of employer liability.

Accordingly, we have decided not to waive employer liability in this case. .   .   .

that finding. *Camp v. Pitts*, 411 U.S. 138, 143, [93 S.Ct. 1241, 36 L.Ed.2d 106] (1973). The PBGC's decision letter summarizes A–T–O's arguments and states a reason for the denial which is clearly consistent with the statute. Nor does A–T–O ever argue otherwise. Rather, A–T–O argues that the denial of its application was really based on standards suggested in two predecisional interagency memoranda, but not adopted in the decision letter. The law is clear that the reasonableness of the decision cannot be undermined by predecisional memoranda that reveal reasons which an agency did not finally adopt. *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 152, [95 S.Ct. 1504, 44 L.Ed.2d 29] (1974).

The administrative record[19] does not support PBGC's contentions that the arguments made by A–T–O were considered by PBGC and that the May 19 letter stated the agency's reasons for denying the waiver application.

On March 5, 1976, the PBGC's Division of Plan Terminations (DPT) wrote to the General Counsel's Office requesting an opinion and stating:

> The 10–K report filed annually with SEC, shows that A–T–O, Inc. had after-tax profits of over $11,000,000 in 1974. *Therefore, a liability of $119,000* [the amount of unfunded liability calculated by the OPPD] *would not prove to be an unreasonable hardship, and if the ability to pay is the major issue in granting a waiver, then in this case we would recommend that the waiver be denied. However, since the term unreasonable hard-*

*ship has not been defined, we are submitting this case for your assistance in reaching a decision on the waiver request.* [Emphasis indicates formerly deleted material.]

A staff attorney in the general counsel's office by memorandum of March 23, 1976, advised the deputy general counsel as to A–T–O's petition for waiver (emphasis throughout the below excerpts from the memoranda indicates formerly deleted material).

The memorandum notes that the maximum funding policy that A–T–O pursued after acquiring Springfield reduced the accrued unfunded liability from $200,000 to $193,169.

> Although funding of the plan had been at the minimum ,evel prior to the acquisition of Springfield by A–T–O, A–T–O began funding the initial Springfield Plan in 1970 at the maximum rate deductible under the Internal Revenue Code. As of March 31, 1969, the unfunded accrued liability *was approximately $200,000.* Despite the accelerated contributions begun by A–T–O during 1970–1974, the plan had an unfunded accrued liability of $193,169 of which $182,689 was vested as of the date the plan terminated on November 30, 1974. *The amount of the unfunded liability is legitimately traced to the advanced age of the participants, as opposed to systematic inadequate funding.*

PBGC recognized that the cause of the Springfield closing—continuing loss of money—arose in 1973 prior to ERISA's enactment.

**19.** On March 24, 1977, this court ordered the administrative record of PBGC to be filed. Subsequently, PBGC filed the administrative record but with portions of in-house memorandum deleted. A–T–O moved to compel discovery of the deleted material and PBGC opposed discovery on the grounds that the material need not be disclosed under the Freedom of Information Act (FOIA) because it was predecisional non-factual material prepared during the agency's deliberative process. By a memorandum and order of September 15, 1977, the

court ordered the material produced for *in camera* inspection. Upon inspection, the court found that the deleted material was in fact the basis for the PBGC's final decision. The material had been adopted by PBGC as its reasoning behind its final decision, and as such, was subject to disclosure under the FOIA. Accordingly, the court ordered full disclosure of the deleted material on September 29, 1977; and it thereby became a useable part of the administrative record filed in this court.

The decision to close Springfield arose in 1973 prior to the enactment of the Employee Retirement Income Security Act of 1974. . . .

In March 1973, A–T–O focused on the economic problems at the Springfield operation and determined to infuse capital and new personnel into saving the Springfield venture. Despite the rehabilitation efforts, however, Springfield continued to lose money. . . .

Without defining "unreasonable hardship," the memorandum stressed lack of any facts being advanced to show why imposition of employer liability "would be an unreasonable hardship" on A–T–O.

*Nowhere in the petition, or the file, including the Case Officer's recommendation, are there advanced any facts showing why imposition of employer liability in this case would be an unreasonable hardship on the operations of A–T–O.*

*DPT presumably sought our assistance in this matter for a definition of unreasonable hardship. However, the facts of the case do less than give us an indication of what is or what is not unreasonable hardship than they make clear the legitimacy of A–T–O's terminating the Springfield plan. . . .*

The memo concludes that despite the "attractive . . . equities . . . in terms of ATO's responsibility and lack of culpability," a denial of the waiver petition because of lack of "economic hardship" will enable the agency to avoid defining "unreasonable hardship."

*. . . The fact of plan coverage in this instance is also due to the unfortunate lengthy closing procedure, even though the decision to terminate was made prior to enactment.*

*As attractive as the equities are in terms of A–T–O's responsibility and lack of culpability for any under-funding, I conclude that the petition should be denied on the ground that no economic hardship to the single employer A–T–O*

*has been shown. At best A–T–O has demonstrated that the corporation will realize less on the Springfield liquidation if employer liability is imposed.*

*Should we deny the petition for waiver on the foregoing grounds, we need not define what constitutes an unreasonable hardship. If you concur in the recommended disposition, I will prepare an appropriate covering letter.*

The General Counsel's Office recommended that the Division of Plan Terminations adopt the reasoning of the March 23 memorandum when it stated in a March 30, 1976 memorandum that:

*This has reference to your memorandum of March 5, 1976.*

*In the attached March 23 memorandum, our staff recommended that the petition should be denied on the grounds that no economic hardship to the single employer A–T–O Inc. has been shown. I concur in the staff recommendation for the reasons discussed in the staff memorandum.*

Shortly thereafter, the May 19, 1976 letter denying A–T–O's waiver petition based upon the reasoning in the March 23 staff memorandum, was issued.

"Unreasonable hardship," the critical term in sections 1304(f) and 1362, is construed to mean an imposition of employer liability that would result in either:

a. an inordinate financial burden, or

b. an inequitable privation

when assessed in connection with the operation and termination of the pension plan and the conduct of the employer's related business.

Not only shunning its duty to first define "unreasonable hardship" before it applied the term, PBGC actually misdefined the term when it limited "unreasonable hardship" to an economic hardship.[20] Indeed, not only did PBGC, in effect, adopt the economic hardship test in its May 19, 1976 letter, but it also set an arbitrarily high standard to meet this test when it stated that:

---

**20.** Had Congress intended the employer's net worth to be the sole determining factor of "unreasonable hardship," it would have so provided as it did in section 1362(b)(2) where it set a ceiling upon employer liability.

. . . something more must be shown [to be "unreasonable"]. For instance, we have granted a waiver when the employer demonstrated that he would be unable to continue in business due to imposition of employer liability.

Failing to use and apply the broader and proper meaning of the term "unreasonable hardship," PBGC did not act "in accordance with law." Hence, it violated Title 5, U.S.C. § 706(2)(A).

 *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1970) prescribes that "[s]ection 702(2)(A) requires a finding that *the actual choice made* was not 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law'." (Emphasis added.) To make such a finding,

. . . the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. [Citations omitted.] Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

*Id.* at 416, 91 S.Ct. at 823. PBGC failed to base its decision upon a consideration of all the relevant factors that fall within the term "unreasonable hardship" as previously defined. The agency did in fact ignore the factual record. Although PBGC did analyze the equities and conclude that an imposition of liability on A–T–O would be inequitable, it nevertheless denied A–T–O's waiver petition. This denial was therefore violative of Title 5, U.S.C. § 706(2)(A) as "arbitrary, capricious, [and] an abuse of discretion." Accordingly, PBGC's decision to deny A–T–O's waiver petition as set forth in the May 19, 1976 letter of decision is hereby set aside as violative of Title 5, U.S.C. § 706(2)(A).

## V.

On the grounds determined and for the reasons stated heretofore, the motion for summary judgment of PBGC is denied and A–T–O's motion for summary judgment is granted.

Pursuant to Title 28, U.S.C. § 2202, this controversy is remanded to PBGC to exercise its jurisdiction over the Plan to the extent provided in Title IV of ERISA in a manner not inconsistent with this opinion.[21]

IT IS SO ORDERED.

---

**21.** Since the disposition of this case is not dependent upon constitutional questions, it is unnecessary to rule on A–T–O's application for a three-judge court.