592 F.2d 947
 1 Employee Benefits Ca 1450
 NACHMAN CORPORATION, Plaintiff-Appellee,
v.
PENSION BENEFIT GUARANTY CORPORATION and International
Union, United Automobile, Aerospace & Agricultural
Implement Workers of America,
Defendants-Appellants.
 Nos. 77-2146, 77-2147.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 26, 1978.
Decided Jan. 23, 1979.
 
 M. Jay Whitman, International Union, UAW, Detroit, Mich., Mitchell L. Strickler, Deputy Gen. Counsel, Pension Benefit Guaranty Corp., Washington, D. C., for defendants-appellants.
 Joel D. Rubin, Chicago, Ill., for plaintiff-appellee.
 Before CUMMINGS, Circuit Judge, WISDOM, Senior Circuit Judge,* and SPRECHER, Circuit Judge.
 SPRECHER, Circuit Judge.
 
 
 1
 The Pension Benefit Guaranty Corporation and the United Auto Workers appeal from the district court order granting summary judgment in favor of the plaintiff, Nachman Corporation. The lower court granted declaratory relief, limiting Nachman's pension liability to the amounts accumulated in a pension plan trust fund.
 
 
 2
 The collectively bargained pension plan contains a clause excluding employer liability by limiting the employees' recourse to the assets of the pension fund. The issue raised on appeal is whether the Employee Retirement Security Income Act of 1974 (ERISA), 29 U.S.C. §§ 1001-1381 (1975), supersedes the employer liability disclaimer and thereby imposes liability for the payment of vested benefits on an employer who, after September 2, 1974, terminates a covered pension plan with insufficient assets. Additionally, Nachman challenges the constitutionality of ERISA if construed to impose liability on employers for vested unfunded benefits. We hold that ERISA does subject the plaintiff to liability for the payment of unconditionally vested benefits effective September 2, 1974 and that this construction does not contravene the Due Process Clause of the Constitution. Accordingly, we reverse the judgment of the district court.
 
 
 3
 * Pursuant to collective bargaining with the UAW, in 1960 Nachman established a pension plan for certain employees at its Armitage Avenue facility in Chicago. The plan terms provided for vesting of benefits after employees fulfilled specified age and length-of-service requirements. This pension plan is characteristic of "defined-benefit" plans, promising a fixed monthly benefit level for each year of service. As is typical of a defined-benefit plan, Nachman was required to make annual contributions to a trust fund on an actuarial basis. Those contributions were calculated by reference to administrative costs of the fund, benefit liabilities accruing during the current plan year ("normal costs"), and the amounts necessary to amortize the past service liability over thirty years.[1] The parties do not dispute that Nachman complied fully with the funding obligations imposed by the plan.
 
 
 4
 On October 1, 1975, Nachman gave timely notice to the UAW that it was terminating the pension plan effective December 31, 1975. The termination accompanied the closing of the Armitage Avenue facility, which had become unprofitable. The propriety of the termination is not challenged.
 
 
 5
 It is also undisputed that the assets in the trust fund are insufficient to pay all the vested benefits which accrued before December 31, 1975. Apparently the fund assets can provide only thirty-five percent of the accrued vested benefits. Under the terms of the plan, the employees' benefits would be reduced ratably. Nachman would not be obligated to assume liability for the unfunded benefits. Article V, section 3 of the plan provides:
 
 
 6
 Benefits provided for herein shall be only such benefits as can be provided by the assets of the Fund. In the event of termination of th(e) Plan, there shall be no liability or obligation on the part of the company to make any further contribution to the Trustee except such contributions, if any, as on the effective date of such termination, may then be accrued but unpaid.
 
 
 7
 Nachman brought an action for declaratory relief to determine whether ERISA would impose any liability on it for the vested, but unfunded, benefits. The district court granted summary judgment in Nachman's favor, holding that Congress did not intend until January 1, 1976, to subject employers to liability for unfunded benefits which they had disclaimed. Since Nachman terminated the pension plan prior to that date it was not found subject to statutory liability.
 
 II
 
 8
 In 1974 Congress passed the Employee Retirement Income Security Act (ERISA) in order to establish "minimum standards . . . assuring the equitable character of . . . (private pension) plans and their financial soundness." 29 U.S.C. § 1001(a). ERISA consists of four titles, each designed to correct different abuses perceived in the private pension system. Title I attacks the lack of adequate "vesting" provisions in many plans. Before ERISA, for example, if a plan did not provide for vesting until retirement, an employee with 30 years of service could lose all rights in his pension benefits in the event that his employment was terminated prior to retirement. Title I establishes minimum vesting standards to ensure that after a certain length of service an employee's benefit rights would not be conditioned upon remaining in the service of his employer. Employers were required to amend the terms of their plans to reflect these minimum standards effective January 1, 1976. Id. at § 1053(a). A second area of difficulty was the inadequacy of the funding cycle used by many plans. To improve the fiscal soundness of these pension funds, Title II amends the Internal Revenue Code to require minimum funding. Title III imposes fiduciary responsibilities on the trustees of the pension funds and provides for greater information and disclosure to employee-participants. The final area of concern addressed by ERISA was the loss of employee benefits which resulted from plan terminations. In order to protect an employee's interest in his accrued benefit rights when a plan failed or terminated with insufficient funds, Title IV establishes a system of termination insurance, effective September 2, 1974.
 
 
 9
 The mechanics of the insurance system established in Title IV control the resolution of this case. Congress created the Pension Benefit Guaranty Corporation (PBGC) within the Department of Labor to administer the termination insurance program. The PBGC guarantees the payment of "nonforfeitable benefits (other than benefits becoming nonforfeitable solely on account of the termination of a plan) under the terms of a plan which terminates at a time when . . . this title applies to it." Id. at § 1322(a). Prior to the termination by an employer-sponsor of a covered pension plan, a notice of intent to terminate must be filed with the PBGC. Id. at § 1341(a). The PBGC then examines the plan and determines whether the assets of the fund are sufficient to pay all benefits guaranteed by the Act. If the assets are sufficient, termination proceeds. If, on the other hand, the PBGC is unable to determine that the assets are sufficient, a trustee is appointed and the guaranteed benefits are then paid out from the trust assets and, if those are insufficient, from PBGC funds.[2] Id. at §§ 1341(c) & 1342(b).
 
 
 10
 When the PBGC guarantees benefits in excess of the fund assets, the act provides for recovery from the employer-sponsor. Id. at § 1362. The amount of the employer's liability is determined by the value of the "plan's benefits guaranteed under this subchapter on the date of termination" offset by the allocable assets of the trust fund. Id. at § 1362(b)(1). Liability, however, is limited to a maximum of thirty percent of the net worth of the employer. Id.
 
 
 11
 Nachman's potential liability to the PBGC depends upon whether the employees' vested benefits, unfunded at the date of termination, are " guaranteed" under Section 1322, that is, whether these benefits are " nonforfeitable . . . under the terms of a plan" and the plan termination occurred after the effective date of Title IV, September 2, 1974. If they are so guaranteed, the PBGC must provide them and assess liability against the employer.[3]
 
 
 12
 It is conceded that the benefits in issue were vested under the terms of the plan. Thus, the precise question before us is only whether the plan term limiting benefit rights to the assets of the fund rendered the rights forfeitable and thus not guaranteed.
 
 
 13
 Title IV does not provide a definition of "nonforfeitable." However, the word nonforfeitable is used in Title I, the "minimum vesting" sections, as well. Title I requires that after January 1, 1976, every plan must provide that benefits become "nonforfeitable" upon the satisfaction of the minimum eligibility requirements. Id. at § 1053(a). The term "nonforfeitable right" is defined for purposes of Title I in Section 1002(19) as
 
 
 14
 a claim obtained by a participant or his beneficiary to that part of an immediate or deferred benefit under a pension plan which arises from the participant's service, which is unconditional, and which is legally enforceable against the plan.
 
 
 15
 Another definition of nonforfeitable for the purposes of Title IV was promulgated by the PBGC as the administering agency. Benefits are nonforfeitable, and guaranteed, if
 
 
 16
 on the date of termination of the plan The participant has satisfied all of the conditions required of him under the provisions of the plan to establish entitlement to the benefit, except the submission of a formal application, retirement, or the completion of a required waiting period.
 
 
 17
 29 C.F.R. § 2605.6(a) (1977) (emphasis added). Nachman's employees have satisfied all conditions required of them. The benefits in issue are therefore clearly "nonforfeitable" if the PBGC definition is employed.[4]
 
 
 18
 The district court concluded that Nachman employees did not have nonforfeitable rights under the plan. Relying on the definition provided in Title I, the judge concluded that the employer liability exclusion clause in the plan rendered the employee rights both "conditional" and not "legally enforceable" and therefore forfeitable. The court reasoned that since Title I requires that plans be amended to make benefits nonforfeitable, such exclusion clauses could not be operative after January 1, 1976, the effective date of that title. Since the Nachman plan was terminated before Title I took effect, however, the judge concluded the clause retained validity. The court found no contrary legislative intent, relying on the congressional purpose to delay the effective date of the minimum vesting requirements until January 1, 1976. Under the lower court reading of the Act, between September 2, 1974 (the effective date of Title IV) and January 1, 1976 (the effective date of Title I) the PBGC would only be authorized to guarantee benefits which had become vested and had not been disclaimed by the employer under the terms of the plan.
 
 
 19
 We conclude that ERISA was designed to insure benefits which were vested under the plan terms, without regard to liability exclusion clauses, effective September 2, 1974. Benefits which would only vest by mandate of Title I standards rather than prior plan terms would not be insured until 1976. Since the Nachman plan was terminated after 1974, and since the benefits had admittedly vested under the terms of the plan (without regard to Title I) we hold that Nachman is subject to liability under ERISA. 29 U.S.C. § 1362.[5]
 
 III
 
 20
 We agree with the district court that the definition of " nonforfeitable" provided in Title I should govern the construction of that term's use in Title IV.[6] However unlike the district court, we conclude that the PBGC definition is consistent with the Title I definition. Although the district court's further construction is linguistically plausible, we conclude that the benefit rights of Nachman's employees fit within the Title I definition of "nonforfeitable." Reference to the legislative history and the fundamentals of pension plans in effect before the passage of ERISA illustrates beyond any doubt that the PBGC definition also reflects the construction of the Title I definition intended by Congress.
 
 
 21
 Under ordinary usage, it may seem illogical to conclude that the Nachman plan provides employees with nonforfeitable benefits when a clause in the plan expressly precludes recovery from the employer in the event the plan terminated with insufficient assets. It certainly appears to be a forfeiture. This is undoubtedly the "illogic" which led the district court below, and the district court in A-T-O, Inc. v. Pension Benefit Guaranty Corp., 456 F.Supp. 545 (N.D.Ohio 1978), to conclude the benefits were forfeitable. But see In re Williamsport Milk Products Co., Inc., (M.D.Pa.1978). But as the Second Circuit recently stated in Riley v. MEBA Pension Trust, 570 F.2d 406, 408-09 (2d Cir. 1977), "the court fell victim to the not uncommon error of reading technical pension language as if it were ordinary English speech."
 
 
 22
 Notwithstanding the plausibility of the lower courts' construction of "nonforfeitable" another construction is also possible; and it is that construction which we believe to be the correct one. This construction, like the district court's also derives from the three elements required for nonforfeitability under the Section 1002(19) definition: the "claim" to the benefits must "arise from the participant's service," it must be "unconditional" and it must be "legally enforceable against the Plan." (Emphasis added). The benefit claims in issue can be seen to satisfy all three elements. The claims arise from participant service. Second, although the benefit claim is admittedly not legally enforceable against the employer under the terms of the plan, the statute requires only that the claim be enforceable against the Plan. Nachman's employees' claims are enforceable against the plan, they simply may not be collectable. Nor is their claim against the plan conditional. All conditions placed upon the participant such as age and length of service have been met. The PBGC definition interprets "unconditional" only as referring to those conditions placed on the participant and not to sufficiency of assets.[7] Satisfaction of the claim is dependent upon sufficient assets, but this should not be viewed as a condition on the claim. Under the pre-ERISA terminology, one author clarified that although benefit claims in fact were conditioned on the availability of funds in the trust, they were not to be considered conditional rights:
 
 
 23
 In a basic contradiction to the pure legal concept of vesting, the Benefit under a pension plan that is described as vested, is, in the usual case . . . contingent . . . upon survival . . . (and) upon the availability of assets in the plan. In principle, however, this is no different from some other types of vested property rights such as those embodied in bonds and promissory notes that may not be honored at maturity because of the financial condition of the promisor. In essence, therefore, the vesting of a pension benefit simply means that the realization of the benefit is no longer contingent upon the individual's remaining in the service of the employer to normal retirement age.
 
 
 24
 D. McGill, Preservation of Pension Benefit Rights, 6 (1972). See also Departments of Treasury and Labor, Study of Pension Plan Terminations 1972, 19 (1973).[8]
 
 
 25
 In sum, the definition instructs that nonforfeitability must be measured by the quantum of rights against the plan and without regard to rights against the employer. The liability exclusion clause is therefore irrelevant to a determination of nonforfeitability because it relates only to a claim the employee may have had against an entity other than the plan itself.
 
 
 26
 Not only does this construction more closely conform to the statute itself, but it is also the only construction substantially supported by the legislative history. Two facts from the legislative history are significant in this regard. First, there is ample evidence that Congress used "vested" and "nonforfeitable" interchangeably and understood the definition of "vest" to mean that benefits would "vest" upon the participant's fulfillment of plan requirements regardless of employer liability exclusion clauses.[9] Second, the legislative history also shows that Congress enacted Title IV for the specific purpose of guaranteeing benefits that were lost because of employer liability exclusion clauses.
 
 
 27
 Turning to the first important aspect of the legislative history the interchangeability of Congressional use of the terms "vested" and "nonforfeitable" it must be realized that "vested" had a clear meaning which determined the meaning of its corollary term, "nonforfeitable." It had been commonly understood that benefits would "vest" even when the plans contained employer liability exclusion clauses. See McGill, supra at 6. The Nachman plan itself is illustrative, providing for the "vesting" of benefits upon satisfaction of age and service requirements, despite the inclusion of the exculpatory clause in the plan. Thus the substitution of the word "vested" for the word "nonforfeitable" in the statutory language further clarifies that Title IV guarantees benefits not contractually guaranteed by the employer.
 
 
 28
 The definitional substitution is entirely appropriate. There is overwhelming evidence that the words vested and nonforfeitable were in fact used synonymously in this regard by Congress.[10] Even though the Act uses the word "nonforfeitable," various committee reports as well as remarks of members invariably state that Title IV insures "vested" benefits.[11] During the hearings Senator Bentsen specifically stated that "(t)he risk we are talking about insuring is the vested interest of the participants." Hearings before the Subcommittee on Private Pension Plans of the Senate Committee on Finance, 93d Cong., 1st Sess., Part I at 443 (1973). The words "nonforfeitable" and "vested" appear interchangeably in the dialogue of the history throughout all stages of the legislation.[12] For example, in discussing the minimum funding standards the Senate Committee noted that the "presently vested (benefits) . . . represent the nonforfeitable rights of the employees." S.Rep.No.93-383, I Legislative History of the Employee Retirement Security Income Act of 1974 (hereinafter Legislative History), at 1090. In another Senate Report it was explained that "(o)ne of the major private pension plan considerations centers around the concept of vesting. Vesting refers to the nonforfeitable right or interest which an employee acquires in the pension fund." S.Rep.No.93-127, I Legislative History at 594.
 
 
 29
 The second significant aspect of the legislative history supporting our construction of "nonforfeitable" is even more direct: the purpose of Title IV was to guarantee benefits that might be lost because of employer liability disclaimers. We must note initially that construing ERISA, as did the court below, to cover only instances in which the employer assumed liability for incompletely funded plans would import so narrow a purpose to Congress as to make the enactment of Title IV almost meaningless.[13] Congress was certainly aware of the fact that the standard private pension plan prior to ERISA disclaimed employer liability.[14] Additionally, under this construction the congressional urgency behind Title IV would reasonably have to be further narrowed to reach only the instances where the employer was Both liable for plan deficiencies And insolvent. (Otherwise insurance would be generally unnecessary). There is no question that terminations often result because of some financial difficulty. However, the Treasury-Labor Study of pension plan terminations, on which Congress relied heavily, revealed that only three percent of employees who suffered benefit losses in 1972 worked for employers with a net worth less than the employee benefit losses. Departments of the Treasury and Labor, Study of Pension Plan Terminations 1972, 61 (1973). Further, seventy-one percent of the employees who suffered losses were employed by a firm with a net worth of at least 1,000 times greater than the benefits lost. Id. Therefore Congress clearly perceived the employer liability exclusions as the source of the losses and the problem to be remedied.[15] As early as 1971, the Senate Subcommittee on Labor had concluded:
 
 
 30
 The need for or desirability of insurance arises because of the numerous contingencies which can result in . . . termination. . . . Employers ordinarily have no financial responsibility for pension payments beyond the contributions they are committed to make.
 
 
 31
 Interim Report of Activities of the Private Welfare and Pension Plan Study, Senate Committee on Labor and Public Welfare, Subcommittee on Labor, 92nd Cong., 2nd Sess., 74 (1971).
 
 
 32
 There is, however, no need to infer such a narrow purpose to Congress since in fact Congressional representatives definitely believed that Title IV of ERISA had been written to insure the benefits which employers had declined to guarantee. It was definitively stated during the floor debates in both the House and Senate, that the termination insurance, had it been in force in 1960, would have insured the vested benefit losses of the employees of the South Bend Studebaker plant. II Legislative History at 1639 (Remarks of Senators Bentsen and Javits); III Legislative History at 4694 (remarks of Rep. Brademas).[16] Those losses resulted because the plan disallowed recourse to the employer's assets.[17]
 
 
 33
 Therefore, it is beyond doubt that the vested benefits of Nachman's employees are guaranteed by Title IV. The lower court suggested that even if the benefits were guaranteed Nachman would not be liable. As discussed supra, Section 1362, subjecting employers to liability for all guaranteed benefits, prohibits this conclusion. Moreover, the legislative history confirms that Section 1362 was intended to impose liability on employers for the benefits they had disclaimed contractually. Although the primary concern of the legislature was to guarantee benefits to workers, it was determined that imposition of liability on the employer would be essential to prevent abuse.[18] Title IV was not merely a subrogation scheme as the district court suggested. It was recognized as imposition of the very liability employers had previously refused to assume.[19] Nowhere does this appear more clearly than in the remarks of the opponents of Title IV. Five Congressmen supported a bill to delete Title IV (significantly not Title I) from the act because they objected to its intent to "change the contract of the employer from a promise to make certain contributions to a fund to a promise to pay the pension supported by a pledge of the employer's assets." H.Rep.No.93-533, II Legislative History at 2387-88 (supplemental views of Representatives Quie, Ashbrook, Erlenborn, Eshleman and Hansen).[20] Congress provided that Title IV take effect on September 2, 1974, to ensure "prompt and effective protection." III Legislative History at 4742 (remarks of Sen. Williams). Senator Williams explained the need for the September 2, 1974 effective date:
 
 
 34
 Probably one of the most difficult problems confronted by the Congress was the selection of effective dates for the insurance program, and here both Senate and House conferees worked diligently to arrange a structure of effective dates that would bring the insurance protection generally into effect as quickly as possible. This was done in recognition of the fact that depressed economic conditions in certain regions created the possibility that a number of plans were in critical straits and were terminating or were likely to do so imminently. Lack of immediate protection for beneficiaries in these cases involved workers who had earned . . . pensions notwithstanding the new provisions of the bill which have a delayed effective date.
 
 
 35
 Id. at 4766. To hold that the unconditionally vested benefit rights of Nachman's employees are not insured under the Act would totally subvert the Congressional intent. Since the benefits are guaranteed under the Act, Nachman is subject to liability under Section 1362.
 
 IV
 
 36
 Nachman argues that Congress cannot constitutionally impose retroactive liability for the payment of unfunded, vested benefits under the Due Process Clause. U.S.Const. Amend. V. The Plaintiffs rest their claim of unconstitutionality principally on the Supreme Court's decisions in Railroad Retirement Board v. Alton Railroad, 295 U.S. 330, 55 S.Ct. 758, 79 L.Ed. 1468 (1935) and Allied Structural Steel Co. v. Spannus, 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978). The defendants argue that the liability imposed should be characterized as prospective, but that even if retroactive, this exercise of legislative power is reasonable and constitutional under the Supreme Court decision in Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976).
 
 
 37
 The Supreme Court has confirmed that Congress has broad latitude to readjust the economic burdens of the private sector in furtherance of a public purpose. Only if Congress legislates to achieve its purpose in an " arbitrary and irrational way" is due process violated. Usery v. Turner Elkhorn Mining Co., supra, at 15, 96 S.Ct. 2882; Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978). Turner Elkhorn Mining also instructs however that it is not necessarily true that "what Congress can legislate prospectively it can legislate retrospectively," 428 U.S. at 16, 96 S.Ct. at 2893. Judicial scrutiny of a statute must therefore include an assessment of the rationality of the retroactive effects as a means to achieving the Congressional purpose.
 
 
 38
 Title IV of ERISA does affect Nachman retroactively. The defendants argue that since ERISA only requires employers to assume liability for pension benefits which become due upon terminations after the effective date of the Act, it assesses liability prospectively. This argument, however, relates only to the degree of retroactive impact. Although it is true that the statute applies only to prospective terminations, it also applies retrospectively to invalidate exclusion of liability clauses in pension plans agreed upon prior to ERISA. Thus to the extent that ERISA invalidates Nachman's otherwise valid acts which occurred prior to enactment, it is retroactive. See generally Allied Structural Steel Co. v. Spannus, 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978).[21]
 
 
 39
 The Congressional purpose in enacting Title IV of ERISA was to protect employees from the loss of vested benefits when a pension plan terminates with insufficient funds.[22] Nachman does not argue that this end itself exceeds Congressional regulatory power. Instead, the specific question presented for review is whether the imposition of retroactive liability on employers is an arbitrary and irrational means of achieving this end.
 
 
 40
 The success of Nachman's position ultimately must rest on the applicability of several Supreme Court precedents. Recently, the Supreme Court in Allied Structural Steel invalidated a Minnesota statute assessing liability on employers for the payment of unfunded benefits upon the termination of a private pension plan. Upon termination, covered employers were required to purchase deferred annuities sufficient to provide full pensions to all employees who had worked at least ten years. Allied Structural Steel Co. terminated a pension plan after the effective date of the Act with insufficient funds. The plan provided benefits for employees retiring after having served the company for a prescribed period, in no case less than fifteen years, and contained an exclusion of liability clause. Nine of the eleven employees discharged did not have any vested pension rights under the plan since they had not fulfilled the minimum service requirements. However, these employees had been in the company's employ for ten years and were therefore entitled to benefits under the Minnesota statute.
 
 
 41
 The Supreme Court found the employer could not be held to the liability imposed by the statute. The Court reviewed the statutory scheme and found it constitutionally insufficient, concluding that the legislature had made "no showing . . . that this severe disruption of contractual expectations was necessary to meet an important general social problem." 438 U.S. 247, 98 S.Ct. at 2724. Although decided under the Contract Clause, which is applicable only to state legislation, several authorities have suggested that the analysis employed in Contract Clause cases is also relevant to judicial scrutiny of Congressional enactments under the Due Process Clause. Allied Structural Steel Co. v. Spannus, 438 U.S. at 262, note 9, 98 S.Ct. 2732 (dissenting opinion); Veix v. Sixth Ward Building & Loan Association, 310 U.S. 32, 41, 60 S.Ct. 792, 84 L.Ed. 1061 (1940); Home Building & Loan Association v. Blaisdell, 290 U.S. 398, 448, 54 S.Ct. 231, 78 L.Ed. 413 (1934). See also Hochman, supra note 19, at 695; Hale, The Supreme Court and the Contract Clause, 57 Harv.L.Rev. 852, 890-91 (1944). Both employ a means-end rationality test. However, since we are convinced that ERISA withstands the scrutiny employed under the Contract Clause cases, we need not decide whether the two clauses in fact impose identical restraints on legislative impairment of contracts.
 
 
 42
 A second Contract Clause case,[23] W. B. Worthen Co. v. Thomas, 292 U.S. 426, 54 S.Ct. 816, 78 L.Ed. 1344 (1934), relied upon in Allied Structural Steel Co., may also be cited as support for Nachman's position. In Worthen, the Court invalidated Arkansas legislation exempting all life insurance from creditor attachment. The debt was incurred, judgment was obtained, and the writ of garnishment was issued, prior to the enactment of the legislation. The Court held that this limitation upon the means of enforcing a contract impaired the obligation of contracts and therefore could be justified only if it was enacted "in order to meet public need because of a pressing public disaster" and was "limited by reasonable conditions appropriate to the emergency." Id. at 433, 54 S.Ct. at 819. Applying these standards, the Court was unable to ascertain a public need sufficiently broad to justify an act containing "no limitations as to time, amount, circumstances, or need." 292 U.S. at 434, 54 S.Ct. at 819.[24]
 
 
 43
 In Railroad Retirement Board v. Alton Railroad, 295 U.S. 330, 55 S.Ct. 758, 79 L.Ed. 1468 (1935), the Supreme Court invalidated under the Due Process Clause a federally imposed compulsory retirement and pension system for all carriers subject to the Interstate Commerce Act. The Act required employers to pay the cost of retirement pensions for all workers presently in their employ as well as for those workers who had terminated employment in the year prior to enactment. Whether the purpose of the legislation was viewed as a legislative effort to improve efficiency, safety or the retirement security of workers,[25] the Court found it was arbitrary to achieve these ends through the "imposition of liability to pay again for services long since rendered and fully compensated," 295 U.S. at 354, 55 S.Ct. at 764, and violated Due Process.
 
 
 44
 The defendant, on the other hand, relies principally on the Supreme Court's decision in Usery v. Turner Elkhorn Mining, 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976). There the Court upheld Congressional imposition of liability on coal industry employers to compensate employees suffering from black lung disease. The challenged provision subjected employers to liability for injury to employees who had terminated employment prior to the effective date of the Act. The Court resolved that Due Process was satisfied because the legislation represented "a rational measure to spread the costs of the employees' disabilities to those who have profited from the fruits of their labor . . . ." 428 U.S. at 18, 96 S.Ct. at 2893.
 
 
 45
 Application of the factors relevant to judicial assessment of rationality, as distilled from these and other precedents, indicates that Title IV of ERISA satisfies Due Process. Rationality must be determined by a comparison of the problem to be remedied with the nature and scope of the burden imposed to remedy that problem. In evaluating the nature and scope of the burden, it is appropriate to consider the reliance interests of the parties affected, Allied Structural Steel Co., 438 U.S. 234, 98 S.Ct. 2716; Adams Nursing Home of Williamstown, Inc. v. Mathews, 548 F.2d 1077, 1080-81 (1st Cir. 1977); whether the impairment of the private interest is effected in an area previously subjected to regulatory control, Allied Structural Steel Co.,438 U.S. 234, 98 S.Ct. 2716; Federal Housing Administration v. The Darlington, Inc., 358 U.S. 84, 91, 79 S.Ct. 141, 3 L.Ed.2d 132 (1958); the equities of imposing the legislative burdens, Alton Railroad, 295 U.S. at 354, 55 S.Ct. 758; Turner Elkhorn Mining, 428 U.S. at 19, 96 S.Ct. 2882, and the inclusion of statutory provisions designed to limit and moderate the impact of the burdens. W. B. Worthen Co., 292 U.S. at 434, 54 S.Ct. 816; Allied Structural Steel Co., 438 U.S. 234, 98 S.Ct. 2716. It must be emphasized that although these factors might improperly be used to express merely judicial approval or disapproval of the balance struck by Congress, they must only be used to determine whether the legislation represents a rational means to a legitimate end.[26] See Turner Elkhorn Mining, 428 U.S. at 18-19, 96 S.Ct. 2882.
 
 
 46
 Congress determined that each year somewhere in the vicinity of 20,000 workers lost vested pension benefits due to causes beyond their control when a pension plan terminated.[27] Given that workers had "anticipated" that these vested benefits would provide retirement security, Congress viewed the termination losses as an abuse of the private pension system in need of correction. 29 U.S.C. § 1001(a). Thus, unlike the record before the Supreme Court in Allied Structural Steel Co., here we have ample evidence that Congress perceived a widespread problem of national importance.[28]
 
 
 47
 An analysis of the retroactive burden imposed suggests that unlike the legislation in Allied Structural Steel Co., Worthen and Alton Railroad, the burdens imposed by ERISA are rationally related to the Congressional purpose. It is true that the monetary measure of Nachman's potential liability cannot be characterized as insubstantial.[29] Further, Title IV of ERISA does displace reliance interests of the employer. If the employer had known that he would be liable for funding the insufficiencies upon termination of the plan, the company either would not have established the plan or perhaps would have utilized a more accelerated funding schedule.[30] In Allied Structural Steel Co., the Supreme Court emphasized the gravity of altering an employer's obligation "in an area where the element of reliance was vital the funding of a pension plan." 438 U.S. at 246, 98 S.Ct. at 2724. However, the nature of the reliance interests in this case can be distinguished in several respects. First, the Minnesota statute imposed liability for payment of benefits to employees who, since they had not fulfilled service requirements, had no vested rights under the plan. Thus the Minnesota employer had a far greater reliance interest displaced than the only reliance displaced by Title IV the belief that the company would not be liable for funding deficiencies in the event of a plan termination. The Minnesota employer had not funded the plan to ever accommodate payment of benefits upon completion of only ten years service, as the Act now required. This is the only reliance element emphasized by the Supreme Court in Allied Structural Steel Co. an element not present in this case.[31]
 
 
 48
 The second and more important distinction in the nature of the reliance interests is that in this case Congress found that the employees' reliance interests in vested benefits outweighed the employer's reliance on prior funding. In Allied Structural Steel Co., the Supreme Court specifically stated that, "(i)n some situations the element of reliance may cut both ways," but that "Minnesota did not act to protect any employee reliance interest demonstrated on the record." 438 U.S. at 246, 98 S.Ct. at 2724 n. 18. The Supreme Court was unwilling to speculate that employees without any vested rights under the plan had any substantial reliance interests. Title IV, however, protects the reliance interests of employees in benefit rights which had vested under the pension plan, an interest which, prima facie, is stronger than interests in unvested rights. Moreover, this reliance interest is in fact demonstrated on the legislative record. Congress found that employees' expectations for retirement security were being defeated by plant closings and other causes beyond their control.[32] The third and final distinction in the reliance interests is that the expectation of the employer may also rationally be given less weight by Congress since pension plan terminations had previously been subject to federal regulation,[33] another element notably missing in Allied Structural Steel Co. 438 U.S. at 234, 98 S.Ct. 2716.
 
 
 49
 The basic equities of imposing the liability has also been relevant to the determination of whether the burden is irrational. In Allied Structural Steel Co., and Alton Railroad the Court emphasized that the employer was being forced to pay added compensation for fully compensated services. The employers received no benefit in the bargain. In Alton Railroad the employer had never agreed to pay any retirement benefits. In Allied Structural Steel Co. the employer had agreed to pay retirement only if the employee served him for the requisite period of time a time period not satisfied by nine of the eleven employees terminated. As the Supreme Court has noted, "the 'true nature' of the pension payment is a reward for length of service." Alabama Power Co. v. Davis, 431 U.S. 581, 593, 97 S.Ct. 2002, 2009, 52 L.Ed.2d 595 (1977). Here, however, Nachman received the benefit he bargained for. The Nachman employees entitled to ERISA benefits in this case served Nachman for the requisite number of years required by the company under the terms of the plan and thus conferred the full benefit on the employer. In this case, then, the question Congress answered was not merely who should provide workers with retirement income, but who should bear the costs of a plan termination: a solvent employer who has received the full benefit he bargained for or the employee with vested benefit rights. As in Turner Elkhorn Mining, it was reasonable for Congress to conclude that this liability represented "an actual, measurable cost of . . . (the employer's) business." 428 U.S. at 19, 96 S.Ct. at 2894.
 
 
 50
 Perhaps the most important facts distinguishing ERISA from the Minnesota statute in Allied Structural Steel are those revealing the Congressional attempt to moderate the impact of the liability imposed. Title IV provisions represent a rational attempt to impose liability only to the extent necessary to achieve the legislative purpose. Congress concluded that it was necessary to insure unfunded vested benefits and established a federal corporation for that purpose. However, it was also determined that it would not be possible to maintain an effective insurance program without imposing some liability on employers. The abuses employer liability was designed to cure included terminations motivated by a desire to avoid the continued burden of funding.[34] III Legislative History at 4741 (remarks of Sen. Williams); II Legislative History at 3382 (remarks of Rep. Gaydos). Congress was also concerned that without the risk of liability, employers might use promises of higher retirement benefits for bargaining leverage, knowing that the PBGC would be required to fulfill the promise. S.Rep.No.93-383, I Legislative History at 1155. It was also believed that to impose liability would cause employers to assume a more responsible funding schedule. II Legislative History at 1873 (remarks of Sen. Griffin). These first two considerations would not have been relevant in the Minnesota scheme because no agency was established to assume primary responsibility for the payment of benefits.
 
 
 51
 Acknowledging that employers on the verge of bankruptcy would be unlikely to terminate pension plans solely to take advantage of termination insurance, Congress provided net worth limitations on the amount of potential liability. 29 U.S.C. § 1362. Congress also devised other provisions to temper the burdens imposed. Employers will not necessarily be liable for the full amount of benefits promised in the plan, since Congress set a level on the amount of benefits guaranteed. 29 U.S.C. § 1322(b)(3). In Section 1323 Congress required the PBGC to provide optional insurance to an employer who desires to protect against this contingent liability.[35] Finally, Title IV grants the PBGC discretion to arrange reasonable terms for the payment of liability. 29 U.S.C. § 1367. Thus Title IV of ERISA, unlike the statutes invalidated under Due Process or the Contract Clause does have "limitations as to time, amount, circumstances, (and) need." W. B. Worthen, 292 U.S. at 434, 54 S.Ct. at 819.
 
 
 52
 The record supporting the enactment of ERISA, wholly unlike that present in Allied Structural Steel, demonstrates that "the presumption favoring 'legislative judgment as to the necessity and reasonableness of a particular measure' " must be allowed to govern here. 438 U.S. at 247, 98 S.Ct. at 2724. Turner Elkhorn Mining, 428 U.S. at 18, 19, 96 S.Ct. 2882; Williamson v. Lee Optical Co., 348 U.S. 483, 488, 75 S.Ct. 461, 99 L.Ed. 563 (1955). Title IV of ERISA satisfies Nachman's rights to Due Process.
 
 
 53
 The order of the district court is reversed.
 
 
 54
 Reversed.
 
 
 
 *
 Senior Circuit Judge John Minor Wisdom, of the United States Court of Appeals for the Fifth Circuit, is sitting by designation
 
 
 [1]
 The plan credits an employee for years served prior to the establishment of the plan. "Past service liability" refers to the cost of paying monthly benefits for those years
 
 
 [2]
 The PBGC funds are collected through premiums assessed against employer-sponsors and invested in various accounts. 29 U.S.C. §§ 1305-07
 
 
 [3]
 The district court suggested that although Nachman could not be liable to the PBGC for the payment of the benefits, the PBGC might nonetheless be required to provide those lost benefits to the employees. 436 F.Supp. at 1334. Nothing in the statutory language or history of the Act supports this conclusion. The measure of the PBGC's obligation to provide benefits and the measure of employer liability are identical under the Act; that measure is the amount of benefits "guaranteed." 29 U.S.C. §§ 1361-62. The effective date of both sections was September 2, 1974. Id. at § 1381(a). Furthermore, the Act provides expressly for PBGC assumption of liability without recourse to the employer only for those terminations occurring between June 30, 1974 and September 2, 1974. Id. at § 1381(b)
 
 
 [4]
 The PBGC has relied on this definition in guaranteeing millions of dollars in unfunded benefits disclaimed by employers who terminated plans prior to January 1, 1976. More than 12,000 employees are receiving such benefits from the PBGC
 
 
 [5]
 We express no opinion on the amount of that liability. As noted, § 1362 contains a net worth limitation. In addition, the PBGC has the authority to defer § 1362 liability and to make special repayment arrangements. 29 U.S.C. § 1367
 
 
 [6]
 The defendants argue it should not since Title I specifically limits the definitional provisions to that subchapter. 29 U.S.C. § 1002. But we agree with the proposition cited by the lower court that: "(a)n earlier specific definition may properly color a subsequent use of the same words without redefinition." Kent Mfg. Corp. v. Commissioner, 288 F.2d 812, 815 (4th Cir. 1961)
 
 
 [7]
 Some conditions on vested benefits related to requirements imposed on the participants might render the benefits forfeitable, at least until 1976 when Title I would invalidate such conditions. See, e. g., the benefit rights in Riley v. MEBA Pension Trust, 570 F.2d 406 (2d Cir. 1977). In this case, the vesting was unconditional
 
 
 [8]
 Prior definitions of nonforfeitable clarify the use of the term "unconditional." H.R.2 as reported, defined a nonforfeitable pension benefit as a:
 legal claim obtained by a participant or his beneficiary to that part of an immediate or deferred pension benefit, which arises from the participant's service and is no longer contingent on continued service or any other obligation to the employer, sponsoring organization, or other party in interest.
 H.R.2, 93rd Cong., 1st Sess., § 3(19) (1973), reprinted in II Legislative History of Employee Retirement Income Security Act of 1974, 2251-52 (herein Legislative History). See also S.1557, 93rd Cong., 1st Sess., § 3(t) (1973), I Legislative History at 285. Despite a wide variance in the definitions employed in various versions of the act, there is substantial evidence that the object of coverage in this regard never differed. Thus even though this language was replaced, the committee report accompanying H.R.12906, the bill incorporating definitional language very similar to that eventually passed, clarifies that both definitions were designed to "requir(e) plans to insure unfunded vested . . . (liabilities up to the amounts insured by the Act)." II Legislative History at 3346. See also note 10 Infra.
 
 
 [9]
 The district court in A-T-O, Inc. v. PBGC, 456 F.Supp. at 553 concluded that Congress "was aware of the distinction between 'vested' and 'nonforfeitable,' " concluding that "nonforfeitable" encompasses only those vested benefits not disclaimed by the employer. As discussed Infra, we are convinced that Congress did not understand this to be a difference in the terms
 We find only one statement in the legislative history potentially supportive of this construction of the statute. The district court relied on the following passage in the conference report to conclude that Congress intended to insure only those unfunded, vested benefits for which the employer had assumed liability: "Under the conference substitute, vested retirement benefits guaranteed by the plan . . . are to be covered. . . ." III Legislative History at 4635. The court concluded that if the plan did not guarantee the vested benefits Congress did not intend to guarantee those benefits (until Title I became effective).
 Although the sheer weight of the contrary history probably precludes the district court's conclusion, a closer reading of the paragraph cited reveals the propriety of a different inference than that drawn by the A-T-O court. The sentence reports the conference bill resolution of an issue of what variety of vested benefits should be insured. The report explains that the House version of the bill insured only those benefits "required to be vested under the bills minimum vesting standards" while the Senate version insured all benefits which vested by reason of plan terms. We read the quoted sentence as merely explaining that the Senate version was adopted and that vested benefits "guaranteed" by the plan, rather than Title I, would be insured. Thus it is inappropriate to read the word "guarantee" so strictly in a context where limitation-of-liability issues were not under discussion.
 There in fact never was a dispute between the bills on the desirability of protecting vested benefits without regard to employer liability exclusion clauses. Senator Williams explained that "the conference substitute, as did the House and Senate bills, establishes an insurance program to protect employees against the loss of vested benefits . . ." without any qualification that those vested benefits be recoverable from the employer under the plan.
 The district court in Nachman, on the other hand, apparently recognized that the words were used interchangeably throughout the Act, but nonetheless concluded that Congress used the word "vested" to describe unfunded benefit rights enforceable against the employer. We refuse to presume, without supporting legislative history, that Congress used this standard pension term to mean something other than its accepted definition. The legislative history, as discussed, indicates traditional usage of the term "vested."
 
 
 [10]
 In fact, in the reported version of S.4 the word vested was used where the word nonforfeitable now appears. See S.4, 93rd Cong., 1st Sess., § 402(a) (1973), I Legislative History at 389. The substitution of terms might be explained by reference to the testimony of members from the Department of Labor at the hearings. The Department testified in 1973 that "there is a problem of defining the accrued benefit which will be insured. . . . (W)e probably need to get some consistency between accrued benefits definition for purposes of Internal Revenue as well as for purposes of termination insurance." Hearings before the Subcommittee on Private Pension Plans of the Senate Committee on Finance, 93rd Cong., 1st Sess., Part I at 437. Senator Bentsen responded with some interest in consistent definitions, although emphasizing it was vested benefits Congress intended to insure. Id. at 443. The Internal Revenue Code used the word "nonforfeitable," rather than "vested," in its regulation of plan terminations pre-ERISA. See Treas. Reg. § 1.401-6 (1963)
 Alternatively it is conceivable that "nonforfeitable" was preferred to "vested" to clarify that benefits guaranteed by Title IV must have vested unconditionally during the period before Title I's restrictions on vesting conditions went into effect. See note 7 Supra.
 Moreover, the committee reports reveal clearly that although the statutory language was altered, the intent remained constant. In S.1179, the first Senate bill to use the term "nonforfeitable," the accompanying committee report explained that insured benefits were those "vested . . . under the plan." S.Rep.No.93-383, I Legislative History at 1094.
 
 
 [11]
 The conference report on Title IV was explained as preventing the loss of "vested benefits." III Legislative History at 4741 (1976) (remarks of Senator Williams). See also H.Rep.No.93-533, II Legislative History at 2349; S.Rep.No.93-383, U.S.Code Cong. & Admin.News 1974, p. 4639, Legislative History at 1094, 1149. See also the remarks of Representative Drinan, III Legislative History at 3590 ("The Bill . . . would prevent anyone who has a vested pension benefit from losing benefits because of plan failure for any reason.")
 
 
 [12]
 In one Senate Report reference is made to "vested (I. e., nonforfeitable) rights." S.Rep.No.93-383, I Legislative History at 1112. Both House and Senate Reports refer to "the Term 'nonforfeitable right' or 'vested right' " (Emphasis on the singular form added). H.Rep.No. 93-533, II Legislative History at 2357, S.Rep.No.93-127, U.S.Code Cong. & Admin.News 1974, p. 4639, I Legislative History at 602. Senator Williams explained the conference bill as assuring every employee the attainment of "nonforfeitable or 'vested' " rights in a pension. III Legislative History at 4734. See also H.R.462, 93d Cong., 1st Sess., § 3(26) (1973), II Legislative History at 75, setting out the definition of " 'nonforfeitable right' or 'vested right.' "
 
 
 [13]
 Again the district court found that these benefits would have become insurable under Title I effective in 1976. Title I, however, would have no effect on this problem since it was only directed at ensuring unconditional vesting under the plan. As discussed Supra, it has been traditionally true that benefits can be unconditionally vested and still unrecoverable because of asset deficiencies. Throughout the history it is emphasized that Title I requirements would not ensure the employee of actual receipt of vested benefits only Title IV could do that. See, e. g., S.Rep.No.93-383, I Legislative History 1093-94
 
 
 [14]
 Both legislative and non-legislative sources confirm that the employer rarely assumed liability for underfunding of the plans pre-ERISA. See S.Rep.No.92-634, 92nd Cong., 2nd Sess. at 74 (1971), II Legislative History at 3479 (remarks of Rep. Annunzio); II Legislative History at 3388-89 (remarks of Rep. Erlenborn). See also, A Study of the Termination of UAW Pension Plans reprinted in Hearings on H.R.1269 before the Subcommittee on Labor of the House Committee on Education and Labor, 92nd Cong., 1st Sess. at 164 (1972); Greenough and King, Pension Plans and Public Policy 194 (1976); D. McGill, Fulfilling Pension Expectations 112, 240 (1962) (stating that "except for unusual situations, the employer is under no Legal liability to monitize the benefits credited under a pension plan." (Emphasis in original)
 Evidence in the record here suggests that 78 of the 136 plans terminated before January 1, 1976 contained limitation of liability clauses similar to the one in the Nachman plan, a figure representing a lower percentage than these sources suggest has been traditionally true. This evidence does not reveal however whether some of the terminated plans used various other forms of indirect disclaimers instead of the standard clause. See McGill, Fulfilling Pension Expectations, Supra, at 88-89.
 
 
 [15]
 This is further evident from the repeated expressions of intention to insure all the vested benefit losses reported by the 1972 Treasury-Labor Study. As noted, almost all of the losses reported involved solvent employers. II Legislative History at 1635-36 (remarks of Sen. Bentsen)
 
 
 [16]
 The Studebaker losses were of the greatest magnitude and were frequently cited as representative of the need for termination insurance, See S.Rep.No.93-383, I Legislative History at 1093-94, 1146-47; II Legislative History at 1665-66 (remarks of Sen. Taft); II Legislative History at 3373-74 (remarks of Rep. Brademas)
 
 
 [17]
 See the remarks of Willard Solenburger, Hearings on Private Pension Plans Before the Subcommittee on Fiscal Policy of the Joint Economic Committee, 89th Cong., 2nd Sess., 126, 127 (April 27, 1966)
 
 
 [18]
 See S.Rep.No.93-383, I Legislative History at 1155; II Legislative History at 1873 (remarks of Sen. Griffin); II Legislative History at 3382 (remarks of Rep. Gaydos), stating that employer liability was necessary to "prevent a solvent employer from terminating a plan and transferring the amount of the unfunded vested liabilities to the (PBGC). Absent this procedure the solvent employer would be able to renege on his agreement to contribute to the plan with impunity."
 
 
 [19]
 See Greenough, supra at 194:
 Until the 1974 act . . . the financial obligation of a pension trust was limited to the actual assets of the plan; there was no recourse beyond the limit for those to whom benefits had been promised but for whom the liability had been insufficiently funded. Under the new pension law, the gap between the employer and the pension plan has been bridged. If the PBGC has had to pay benefits to vested participants upon plan termination, employers are liable for reimbursing the insurance corporation for insurance benefits paid. . . .
 The new termination insurance provisions constitute a recognition in public policy that an employer who establishes a pension plan cannot thereafter isolate himself from the financial consequences of the promises made. The reform was long overdue.
 
 
 [20]
 See Representative Erlenborn's lengthy explanation of his opposition to this result during floor debates and the vocal disagreement of other members of the House. II Legislative History at 3388-89, 3390, 3393, 3396, 3399-3400. See also Representative Annunzio's remarks in support of termination insurance on the grounds that "it is unconscionable that an employer is presently under no legal obligation to make good on his pension promise." II Legislative History at 3479
 
 
 [21]
 To be wholly prospective, Title IV of ERISA would have to apply only to pension plans established after the effective date of the act. See Hochman, "The Supreme Court and the Constitutionality of Retroactive Legislation," 73 Harv.L.Rev. 692, 692 (1960)
 
 
 [22]
 As discussed supra, this was the explicit Congressional purpose
 
 
 [23]
 In another recent decision, United States Trust Co. v. New Jersey, 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977), the Supreme Court invalidated state legislation under the Contract Clause. The Court applied a more stringent level of scrutiny to a state's impairment of its own contracts than is required for laws impairing private contracts, 431 U.S. at 22-23, 97 S.Ct. 1505, thus rendering it inapplicable to this case
 
 
 [24]
 It is interesting to note that the beneficiary of the life insurance in the case, wife of the deceased, had been a partner in the business for which the credit was obtained, illustrating the over-inclusive protection afforded
 
 
 [25]
 A majority of the court found that this purpose general improvement of retirement security exceeded the scope of Congressional power under the Commerce Clause. 295 U.S. at 362, 55 S.Ct. 758. But see id. at 374, 55 S.Ct. 758 (dissenting opinion). We do not understand the plaintiff here to raise this objection
 
 
 [26]
 Although explicit consideration of these factors might suggest a risk of judicial usurpation of properly legislative judgments, failure to consider them might ultimately result in no meaningful scrutiny of the legislative process a result prohibited by the Due Process Clause
 
 
 [27]
 See text and notes supra at 956-957 and note 32 infra
 
 
 [28]
 In Allied Structural Steel Co. the Court objected to the "extremely narrow focus" of the Minnesota statute. 438 U.S. 234, 98 S.Ct. 2716. Moreover, the Court found the "only indication of legislative intent in the record" was represented by the Minnesota legislature's concern with one plan termination by White Motor Corp. Id. Finally the Court also notes that the Minnesota legislation had an extremely short effective life, since it was to become void on the effective dates of ERISA. Id. at 248 n. 21, 98 S.Ct. 2725. This time limitation further belies the narrowness of the legislative purpose. None of these defects in the Minnesota scheme are applicable to ERISA
 Although the loss of pension benefits was not considered a national emergency by Congress, Allied Structural Steel Co., confirms the prior precedents holding that retroactive liability can properly be imposed to remedy problems which fall short of an emergency. Id. at 248 n. 24, 98 S.Ct. 2725.
 
 
 [29]
 The Supreme Court in Allied Structural Steel Co., stated that "(m)inimal alteration of contractual obligations may end the inquiry at its first stage" under a Contract Clause analysis. 438 U.S. at 245, 98 S.Ct. at 2723. The record evidence indicates that the average benefit subject to guarantee for Nachman's employees is $77 per month. The assets of the fund are only sufficient to provide an average monthly benefit of $27, thus subjecting Nachman to potential liability for amortizing the average benefit of $50 per month for 135 employees
 
 
 [30]
 See D. McGill, Fulfilling Pension Expectations 276 (1962), concluding that if an employer were subject to liability for the payment of unfunded benefits, "sound financial management and realistic accounting practice would call for the funding on a current and actuarially determined basis of benefit credits not yet vested" a practice apparently not typical of plans excluding employer liability upon termination
 
 
 [31]
 This aspect of differentiation with Allied Structural Steel Co., will be eliminated for terminations which occur after December 31, 1975, since the minimum vesting requirements of Title I will then be in effect. We need not consider the constitutionality of Title I in this case since it is inapplicable here
 
 
 [32]
 The following paragraph represents perhaps the most succinct explanation contained in the Congressional record:
 Concern for loss of benefits by workers after long years of labor through circumstances beyond their control was similarly expressed by President Richard M. Nixon on December 8, 1971, when, in a message to the Congress he said, "When a pension plan is terminated, an employee participating in it can lose all or part of the benefits which he has long been relying on, even if his plan is fully vested. . . . Even one worker whose retirement security is destroyed by the termination of a plan is one too many."
 II Legislative History at 3296.
 
 
 [33]
 The Internal Revenue regulations imposed numerous requirements on the format of private pension plans necessary to obtain favorable tax treatment. Included in those regulations was the mandate that all funded benefits be made nonforfeitable simultaneous with plan termination. Treas.Reg. § 1.401-6 (1963)
 
 
 [34]
 See text and notes supra at 956-957
 
 
 [35]
 This protection would not have been available to Nachman since such insurance would have had to be in effect for 60 months. 29 U.S.C. § 1323(d)