**ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY, et al.,**
**Plaintiffs,**

v.

**NATIONAL RAILROAD PASSENGER CORPORATION, Defendant,**

**and**

**The United States of America, Intervenor-Defendant.**

**No. 80 C 6749.**

United States District Court, N.D. Illinois, E.D.

Nov. 22, 1982.

George Platz, Sidley & Austin, Chicago, Ill., for plaintiff.

Lord, Bissell & Brook, Mary E. Bennett, Chicago, Ill., Roderick C. Dennehy, Jr., Natl. R.R. Passenger Corp., Washington, D.C., for defendant.

William French Smith, U.S. Atty., Dept. of Justice, Washington, D.C., for intervenor.

## MEMORANDUM OPINION AND ORDER

DECKER, District Judge.

Plaintiffs Atchison, Topeka and Santa Fe Railway Company; Burlington Northern, Inc.; Chesapeake and Ohio Railway Company; Baltimore and Ohio Railroad Company; and Union Pacific Railroad Company ("the railroads") have sued the National Railroad Passenger Corporation ("Amtrak") to relieve themselves of their federal statutory obligation to reimburse Amtrak at a specified rate for free or reduced-rate rail transportation services provided by Amtrak to present and retired railroad employees and their dependents ("pass riders"). The railroads seek a declaratory judgment that the federal statutes in question, Public Law 92–316 and Public Law 96–73 (together, Section 405(f) of the Rail Passenger Service Act ("RPSA"), as amended), 45 U.S.C. § 565(f), are unconstitutional. Because the constitutionality of federal statutes has been called into question, the United States of America ("United States") has been permitted to intervene as a defendant. All parties have moved for summary judgment, agreeing that no questions of fact are in dispute in considering the constitutionality of the reimbursement requirement. The railroads' motion for summary judgment is partial, contending that the constitutionality of the formula for reimbursement (as distinct from the reimbursement requirement itself) does turn on a disputed issue of material fact.

The genesis of this controversy is the long-standing practice of the railroads, beginning in the nineteenth century, of providing free or reduced-rate rail transportation service to their current and former employees and their families. Such railroad passengers came to be known as "pass riders" because the employer railroads issued them passes which entitled them to the subsidized service on a space-available basis. No statute, Interstate Commerce Commission (ICC) regulations, or collective bargaining agreement obligated the railroads to provide this service; the parties agree that it was a purely voluntary undertaking.

In 1970, Congress enacted the Rail Passenger Service Act (RPSA), 45 U.S.C. § 501, et seq. The RPSA created a private corporation, the National Railroad Passenger Corporation, known as Amtrak, to take over the passenger rail service which the railroads had previously been required by ICC regulations to provide despite its unprofitability. Specifically, the RPSA authorized Amtrak to enter into a contract (called a "Basic Agreement") with each railroad:

"On or before May 1, 1971, the Corporation is authorized to contract and, upon written request therefor from a railroad, shall tender a contract to relieve the railroad, from and after May 1, 1971, of its entire responsibility for the provision of intercity rail passenger service.... Upon its entering into a valid contract (including protective arrangements for employees), the railroad shall be relieved of all its responsibilities as a common carrier of passengers by rail in intercity rail passenger service under part I of the Interstate Commerce Act [49 U.S.C. 1 et seq.] or any state or other law relating to the provision of intercity passenger service ....

... In consideration of being relieved of this responsibility by the Corporation, the railroad shall agree to pay to the Corporation each year for three years [certain specified sums]."

45 U.S.C. § 561(a). Under the terms of the RPSA, the railroads explicitly retain certain responsibilities, among them:

(1) providing use of tracks and other facilities, 45 U.S.C. § 562,

(2) providing employees to operate and maintain the passenger trains, 45 U.S.C. § 545, and

(3) securing "protective arrangements" for railroad employees to insure that they are not adversely affected by the discontin-

uance of rail passenger service by the individual railroads, 45 U.S.C. § 565.

Finally, "[t]he right to repeal, alter, or amend [the RPSA] is expressly reserved." 45 U.S.C. § 541.

Pursuant to the RPSA, Amtrak did enter into a Basic Agreement with each of the plaintiff railroads. The Basic Agreement entered into with each railroad follows the RPSA guidelines. Section 2.1 of the Agreement states that, "[f]rom and after May 1, 1971, Railroad shall be relieved of its entire responsibility for the provision of Intercity Rail Passenger Service." The question of pass riders is specifically addressed by Section 7.5 of the Basic Agreement: "Transportation privileges, if any, with respect to business and personal travel of Railroad personnel shall be as determined by NRPC [Amtrak]."

On May 1, 1971, the RPSA and the Basic Agreements entered into thereunder went into effect, and Amtrak took over all passenger rail service from the railroads. Amtrak significantly reduced the pass ridership program from what the railroads had provided; passes were issued only to employees of those railroads which operated trains on behalf of Amtrak, and there were no free passes, only half-fare passes. In 1972, Congress decided to restore the pass rider program to the full scope with which it had operated under the railroads and to make the railroads pay for it. Congress amended the RPSA accordingly:

"The Corporation [Amtrak] shall take such action as may be necessary to assure that, to the maximum extent practicable, any railroad employee eligible to receive free or reduced-rate transportation by railroad on April 30, 1971, under the terms of any policy or agreement in effect on such date will be eligible to receive, provided space is available, free or reduced-rate transportation on any intercity rail passenger service provided by the Corporation under this chapter, on terms similar to those available on such date to such railroad employee under such policy or agreement..... The Corporation shall be reimbursed by the rail-

roads by way of payment or offset for such costs as may be incurred in providing transportation services to railroad employees under any policy or agreement referred to in the first sentence of this subsection, including the costs of implementing and administering this section."

Pub.L. No. 92–316 (1972). Amtrak and the railroads failing to agree on a formula for reimbursement, the ICC, acting pursuant to the 1972 amendment, set the rate: $.00079 per passenger-mile of reduced-rate service (Amtrak's estimated variable costs), to be offset by any reduced-rate fares paid by pass riders. In fact, the offset turned out to be complete, so the railroads ended up paying only the costs of administering the pass rider program.

In 1979, Congress amended the passrider provision, revising the formula for reimbursement. By the terms of Pub.L. No. 96–73, 45 U.S.C. § 565(f),

"the Corporation shall be reimbursed by each railroad at the rate of 25 percent of the systemwide average monthly yield per revenue passenger mile. Reimbursement at this rate is in lieu of any charges for liability incident to travel of railroad employees eligible for free or reduced-rate transportation and any other costs incurred by the Corporation in connection with free or reduced-rate transportation."

Although as originally enacted in 1979, the 25 percent reimbursement formula was for two years only, it was made permanent by Pub.L. No. 97–35 (1981), following completion of a congressionally-ordered General Accounting Office (GAO) study of the pass rider problem. The GAO study concluded that the choice between a reimbursement formula based on incremental costs and one based, as the 25 percent formula is, on the value of the service pass riders receive "is a policy decision that the Congress should make." GAO Report to the Congress: *How Much Should Amtrak Be Reimbursed For Railroad Employees Using Passes To Ride Its Trains?*, March 28, 1980, at 30. The GAO reported that it "did

not find adequate analytical evidence to recommend one position over the other." *Id.* at ii.

Unlike reimbursement under the 1972 formula, reimbursement under the 1979 formula imposed measurable financial burdens on the railroads. The plaintiff railroads (but not all railroads) have refused to pay the sums for pass rider service for which Amtrak has billed them since October 1979. They contend that the statutes authorizing Amtrak to collect these sums from them are unconstitutional. They allege four specific constitutional infirmities:

(1) The statutes requiring them to pay for pass riders on Amtrak impair the United States' obligation under P.L. 92–316, a statutory contract between the United States and the railroads, to "relieve [the railroads] of [their] entire responsibility for the provision of intercity rail passenger service." This alleged impairment by the United States of its own contract is alleged to constitute a deprivation of property without due process of law, in violation of the Fifth Amendment.

(2) Even if P.L. 92–316 is not a contractual obligation of the United States which has been unconstitutionally impaired, the Basic Agreement, with identical relief from responsibility language, is such an obligation and has been unconstitutionally impaired.

(3) Even if there exists no contract between the United States and the railroads, the congressionally ordered transfer of wealth from the railroads to their current and past employees and their families (the pass riders) is a deprivation of property without due process of law, in violation of the Fifth Amendment.[1]

(4) Finally, even if Congress may constitutionally require the railroads to reimburse Amtrak for the cost of the pass rider program, the 25 percent reimbursement formula, by requiring the railroads to pay to Amtrak more than the cost of the pass rider program, deprives the railroads of property without due process of law, in violation of the Fifth Amendment.

### I. *P.L. 92–316 as a Contract*

■ A statute is treated as a contract "when the language and circumstances evince a legislative intent to create private rights of a contractual nature enforceable against the State." *United States Trust Co. v. New Jersey,* 431 U.S. 1, 17 n. 14, 97 S.Ct. 1505, 1515 n. 14, 52 L.Ed.2d 92 (1977). The language of the statute in question here, P.L. 92–316, is clearly not that of a contract. Indeed, the term "contract" is used throughout the statute, not to characterize the statute itself, but rather to describe what Amtrak was supposed to enter into with the railroads (i.e., the Basic Agreement). The statute states plainly that *"the Corporation* is authorized to contract and, upon written request from a railroad, shall tender a contract ...," 45 U.S.C. § 561(a) (emphasis added), and that, *"[u]pon its entering into a valid contract* ..., the railroad shall be relieved of all its responsibilities ...." *Ibid.* (emphasis added). The Congress which enacted the RPSA clearly was no stranger to the language of contract, and it chose to employ such language to describe Amtrak's authority, not to characterize its own work. No contractual right to relief from responsibility can flow from a statute which expressly makes such relief contingent on the execution of a true contract between other

---

1. Although plaintiffs' memoranda of law have obscured the issue, plaintiffs may also be attacking the reimbursement provision as a taking of their property for public use without just compensation, in violation of another clause of the Fifth Amendment. Because the railroads do not focus on this contention, and because, if they did they would be suing the wrong defendant (Amtrak, rather than the United States), this court need not discuss it. It is enough to point

out that the plaintiffs have not alleged that compensation is unavailable through a proceeding against the United States in the Court of Claims. The Supreme Court has squarely held that, "an alleged taking is not unconstitutional unless just compensation is unavailable." *Hodel v. Virginia Surface Mining & Reclamation Ass'n,* 452 U.S. 264, 297 n. 40, 101 S.Ct. 2352, 2371 n. 40, 69 L.Ed.2d 1 (1981).

parties. As P.L. 92–316 is not a contract, it cannot be unconstitutionally impaired.

## II. *The Basic Agreement as a Contract*

[3] The Basic Agreement may well constitute a contract between the United States and the railroads. Although Amtrak is the nominal contracting party, the consideration it gives—relieving the railroads from their responsibility to provide passenger rail service—is something that only the United States, if anyone at all,[2] can offer. However, even if it be assumed that the Basic Agreement is a contract between the United States and the railroads, the requirement that the railroads pay for pass riders does not impair any rights vested in the railroads by that contract. This is clear from the "contract"'s language—the initial focus of inquiry in any contractual dispute.

The Basic Agreement relieves the railroads from their "entire *responsibility* for the provision of Intercity Rail Passenger Service." Basic Agreement, § 2.1 (emphasis added). By the railroads' own admission, providing free or reduced-rate transportation to employees and their families was never a responsibility of theirs—it was a purely gratuitous undertaking, like providing a "Christmas turkey," to employ the plaintiffs' own analogy. The railroads' "responsibilities" arose from statute or regulation or from collective bargaining agreements. Those arising from the last were expressly preserved, 45 U.S.C. § 565, while, as discussed above, even some of the statutory or regulatory obligations (provision of tracks, employees, etc.) were not eliminated by the RPSA. *See* 45 U.S.C. §§ 545, 562. The Basic Agreement could not relieve the railroads of a responsibility they never had.

If the scope of the term, "responsibility," may be too slender a reed on which to absolve the United States of contract impairment, additional language in the Basic Agreement underscores the point that this "contract" never protected the railroads against being forced to assume the cost of pass riders. As noted above, the Basic Agreement is not silent on the question of pass riders. Rather, it states explicitly that "[t]ransportation privileges, if any, with respect to business and personal travel of Railroad personnel shall be *as determined by NRPC.*" Basic Agreement, § 7.5 (emphasis supplied). Perhaps Amtrak has a claim that the statutory requirement that passes be issued impairs its rights under this Agreement by invading its discretion, but the railroads have no claim. It may be, as the plaintiffs argue, that this provision is not sufficient, standing alone, to authorize Amtrak to demand reimbursement from them, but it is not Amtrak that rests its rights on the "contract." It is the railroads who claim that the Basic Agreement guarantees their right to be free of the duty to pay for pass riders, when even the most cursory examination of the language of the Agreement reveals that it makes no such provision. Thus, the statutory provisions requiring the railroads to reimburse Amtrak for the cost of pass riders are not unconstitutional impairments of contract for they do not impair any true contractual rights.

## III. *The Due Process Challenge to the Reimbursement Requirement*

The plaintiff railroads concede that the power to order them to pay for pass riders on Amtrak is within the power of the United States to "regulate Commerce ... among the several States ..." U.S. Const. Art. I, § 8, cl. 3. However, they insist correctly that even an exercise of Commerce Clause power will not be upheld if it "contravenes affirmative constitutional limitations on congressional exercise" of that power. *Hodel*, 452 U.S. at 283, 101

---

**2.** There is great merit to Amtrak's contention that the power of the United States under the Commerce Clause to regulate the passenger service responsibilities of the railroads is "an attribute of sovereignty which may not be bartered away." *Lynch v. United States,* 292 U.S. 571,

582, 54 S.Ct. 840, 845, 78 L.Ed. 1434 (1934). However, as the court finds, at least as to pass riders, that the power has not been bartered away it need not reach the hypothetical question of whether it would be constitutional for the United States to engage in such barter.

S.Ct. at 2364. The railroads contend that their right not to be deprived of their property without due process of law, as secured by the Fifth Amendment, is violated by, in effect, forcibly transferring their wealth to their employees through compulsory reimbursements to Amtrak for pass riders. They take particular exception to the reimbursement requirement as it applies to former employees of the railroad, already retired as of the date of the reimbursement statute's enactment. It is said that this is the kind of retroactive increase in worker benefits held unconstitutional by the Supreme Court in *Railroad Retirement Board v. Alton Railroad Co.*, 295 U.S. 330, 55 S.Ct. 758, 79 L.Ed. 1468 (1935). Certainly the Supreme Court has recognized that, "[t]he retrospective aspects of legislation, as well as the prospective aspects, must meet the test of due process, and the justifications for the latter may not suffice for the former." *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 17, 96 S.Ct. 2882, 2893, 49 L.Ed.2d 752 (1976).

The railroads' concession that Congress acted within the limits of the Commerce Clause in requiring them to reimburse Amtrak for pass riders leaves them with an extremely heavy burden to overcome. The Supreme Court has squarely stated:

> "It is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an *arbitrary and irrational* way."

*Id.* at 15, 96 S.Ct. at 2892 (emphasis added). In *Usery*, the Court held that the due process rights of coal mine operators were not violated by a statute requiring them to pay "black lung" benefits to former employees who had retired before the statute requiring payment of the benefits was enacted.

The railroads, in support of their contention that the pass rider reimbursement statute is "arbitrary and irrational," place principal reliance on the *Alton* case, a decision of the Supreme Court in the period

(1935) before the presumption of constitutionality which they must now overcome was firmly established. In *Alton*, the court declared unconstitutional a statute requiring employer-financed pensions for former employees who, though not employed at the time of enactment, had been so employed within the year. The railroads contend that the instant case is more like *Alton* than like *Usery*, because "the purpose of the [black lung] Act [was] to satisfy a specific need created by the dangerous conditions under which the former employee labored—to allocate to the mine operator an actual, measurable cost of his business," *Usery*, 428 U.S. at 19, 96 S.Ct. at 2894, while the point of the pass rider reimbursement statute, as of the *Alton* pension statute, is "simply to increase or supplement a former employee's salary to meet his generalized need for funds." *Ibid.*

Plaintiffs have themselves distinguished *Alton* from the present action by conceding that Congress acted within its powers under the Commerce Clause in requiring them to reimburse Amtrak for pass riders. The *Alton* Court held that Congress had not only violated the rights of employers but had exceeded its commerce power in enacting the pension requirement. While the *Usery* Court also distinguished *Alton* rather than expressly overruling it, the Court's language—"Assuming that the portion of Alton invalidating this provision retains vitality, we find it distinguishable ...," *ibid.* (emphasis added)—is hardly a ringing affirmation of its continued force. At least two lower court decisions since *Usery* have questioned whether *Alton* is still good law. *See A–T–O, Inc. v. Pension Benefit Guaranty Corp.*, 634 F.2d 1013, 1025 n. 13 (6th Cir.1980), and *Pension Benefit Guaranty Corp. v. Ouimet Corp.*, 470 F.Supp. 945, 955 (D.Mass.1979), *aff'd*, 630 F.2d 4 (1st Cir.1980), *cert. denied*, 450 U.S. 914, 101 S.Ct. 1356, 67 L.Ed.2d 339 (1981).

*Alton* may or may not survive. However, assuming that the instant case even

poses a true question of retroactivity,[3] this court is bound by the more recent *Usery* decision and the decision of the Seventh Circuit in *Nachman Corp. v. Pension Benefit Guaranty Corp.*, 592 F.2d 947 (7th Cir.1979), *aff'd on other grounds*, 446 U.S. 359, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980). In an exhaustive and scholarly opinion in *Nachman*, Judge Sprecher clarified *Usery*'s "arbitrary and irrational" test as applied in cases of retroactivity.

In *Nachman*, the court rejected a due process challenge to provisions of the Employee Retirement Income Security Act (ERISA) imposing pension liability on employers for former employees with exclusion of liability clauses in their pension plans even where the service of those employees had terminated before enactment of ERISA. The court restated the *Usery* "arbitrary and irrational" test, and listed the special criteria against which retroactive legislation is to be tested. In evaluating the rationality of retrospective legislation, the court said,

> "[I]t is appropriate to consider [1] the reliance interests of the parties affected, ... [2] whether the impairment of the private interest is effected in an area previously subjected to regulatory control, ... [3] the equities of imposing the legislative burdens, ... and [4] the inclusion of statutory provisions designed to limit and moderate the impact of the burdens...." [All citations omitted.]

*Nachman*, 592 F.2d 960. Two cautionary notes must be struck before applying these factors to the instant case. First, because these criteria were enunciated in the context of legislation found, as this legislation has not been, to impair contractual obligations, the scrutiny it requires may, in fact, be more strict than the instant facts warrant. Second, even in announcing these factors, the Seventh Circuit was careful to emphasize that they were not to be "improperly ... used to express merely judicial approval or disapproval of the balance

struck by Congress, [but] only ... to determine whether the legislation represents a rational means to a legitimate end." *Ibid.*

■ Applying the *Nachman* criteria, the pass rider reimbursement provision of the RPSA is plainly not arbitrary or irrational, even as applied to railroad workers who were no longer employed on the date of enactment.

On the question of reliance, the instant case is illustrative of the principle enunciated by the Supreme Court and applied in *Nachman* that, "[i]n some situations the element of reliance may cut both ways." *Nachman*, 592 F.2d at 962, quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 246, 98 S.Ct. 2716, 2723, 57 L.Ed.2d 727 (1978). As is demonstrated in this court's discussion of the plaintiffs' "contract" claims, the RPSA and the Basic Agreements provide no legitimate basis on which the railroads could rely for protection from financial liability for pass riders. In contrast, the undisputed historical record of nearly one hundred years of railroads providing their present and former employees with passes offers a solid basis for employee reliance. It was the railroads who initiated the pass rider policy, they continued it uninterrupted over a long period of time, and the reimbursement provision only covers employees hired prior to May 1, 1971—i.e., employees hired by the railroads (not by Amtrak) at a time when free or reduced-rate travel was an unquestioned (if unwritten) element of railroad employee compensation.

In this case, as in *Nachman*, "Congress found that the employees' reliance interests ... outweighed the employer's reliance." *Id.* at 961–62. In floor debate on the reimbursement provision, Senator Percy, a sponsor, argued that, "the railroads ... must deliver on their promises of long standing," 118 Cong.Rec. 14791 (1972), while another sponsor, Senator Church, stated that, "the loss of, or reduction of

3. Retroactive legislation, as commonly understood, places new burdens on the affected parties. In this case, all that is new with the enactment of the reimbursement provision is

that the retired railroad worker's pass privilege is enforceable by the United States. The actual financial burden on the railroads of providing the passes is an old, pre-statutory one.

free pass privileges by railroad employees entitled to them was a breach of faith with these people." *Id.* at 14792.

Federal regulation of the railroad industry, including labor relations in that industry, is simply too long-standing and comprehensive to make the second *Nachman* element—whether the impairment of the private interest is effected in an area previously subjected to regulatory control—open to dispute. The plaintiffs have not disputed it.

Applying the third *Nachman* criterion, the equities are not sufficiently in favor of the railroads as to make the congressional decision arbitrary or irrational. The *Nachman* court distinguished *Alton* on the basis that "the employer had never agreed to pay any retirement benefits," *Nachman*, 592 F.2d at 962, and both *Alton* and *Allied Structural Steel* on the basis that, in both cases, "[t]he employers received no benefit in the bargain [struck by Congress]." *Ibid.* Here, of course, the railroads had been agreeing to pay for pass privileges for their employees for almost a century. The railroads, unlike the employers in *Alton* and *Allied Structural Steel*, demonstrably benefited from enactment of the amendment restoring pass privileges to their current and former employees. The most lasting benefit, the retention of the good will of railroad workers [4]—those on wholly private freight lines as well as those serving Amtrak—is at least an intangible benefit. One benefit, however, was real and immediate. The decision in *Baker v. System Federation No. 1*, 331 F.Supp. 1363 (E.D.Pa.1971), indicates that railroad workers were prepared to go on strike in 1971 against private railroad companies over the failure of Amtrak to continue the pass privileges those companies had provided prior to May 1, 1971. While enactment of the 1972 amendments may not have brought lasting tranquility to railroad labor relations, elimination of a grievance intense enough to produce a strike call cannot ra-

tionally be called anything but a benefit to the parties to have been struck.

The railroads contend that the statute in question here does not include provisions designed to limit and moderate the impact of its burdens, the fourth and final *Nachman* criterion. The *Nachman* court nowhere indicated that all four factors must favor the United States in order for a retroactive statute to be upheld, only that all should be considered. Beyond that, the limitation that the court recognized in *Nachman* as dispositive was that the "provisions represent a rational attempt to limit liability only to the extent necessary to achieve the legislative purpose." *Nachman*, 592 F.2d at 962. Such is the case here. The Congress did not indiscriminately distribute pass privileges and require the railroads to bear the expense. Rather, it required the railroads to pay for pass privileges for a carefully selected, narrow class of citizens—those persons employed by or retired from the railroads, who had entered into that employment in the period ending April 30, 1971, and whose expectations of having such lifetime privileges had been engendered by the railroads themselves. This is a sufficient limitation to the burden on the railroads to preclude any finding that the congressional action imposing that burden on them was arbitrary or irrational.

Under the harshest possible scrutiny to which action taken by the Congress under its commerce power can legitimately be subjected, the 1972 RPSA amendment requiring the railroads to reimburse Amtrak for free and reduced-rate travel passes for their current and former employees is neither arbitrary nor irrational. Accordingly, it does not deprive the plaintiffs of their property without due process of law.

IV.  *The Due Process Challenge to the Reimbursement Formula*

The railroads' final contention is that, even if Congress may constitutionally com-

---

4. Even restoring the pass privileges of retired railroad workers can rationally be said to increase the good will of current employees toward their railroad. It would ignore human nature to contend that current workers, who know they will someday be retirees, are oblivious to the treatment of their retired colleagues.

pel them to reimburse Amtrak for pass riders, the reimbursement formula Congress chose in 1979—25 percent of the systemwide average monthly yield per passenger mile—deprives the railroads of their property without due process of law insofar as it makes them pay Amtrak more than the costs pass riders impose on Amtrak. The railroads deny that summary judgment is appropriate on this issue because the precise amount pass riders cost Amtrak is a disputed issue of material fact.

Summary judgment is appropriate where "the moving party is entitled to judgment as a matter of law." Fed.R. Civ.P. 56(c). Such is the case here. While the amount pass riders cost Amtrak may be a disputed issue of fact, it is not material. Having determined that the Congress acted constitutionally in requiring the railroads to reimburse Amtrak for the pass rider service, this court will not second-guess the legislative branch on its selection of a particular mathematical formula for reimbursement, absent a showing that the formula was selected in an arbitrary or irrational manner. Quite to the contrary, the record here strongly supports the rationality of the process by which the Congress chose a reimbursement formula based on the value of the pass privilege to the holders rather than one based on the cost of providing the service. After enacting the value-based formula on an interim basis, the Congress ordered the GAO to study the question. As discussed above, the GAO reported that the analytical evidence did not favor one formula over the other. GAO Report at ii. Given such a finding, this court adopts the GAO Report's principal conclusion: The choice between a cost-based formula and a value-based one "is a policy decision that the Congress should make." GAO Report at 30. With the GAO Report as background, the Congress reaffirmed its choice of the value-based formula by making it permanent in 1981.

A similar challenge to the one the railroads make to this formula was made by the coal mine operators in *Usery* to the scheme under which the Congress determined the liability of each of them for black lung benefits. The words of the Court in *Usery* are dispositive here:

"We are unwilling to assess the wisdom of Congress' chosen scheme .... It is enough to say that the Act approaches the problem of cost spreading rationally; whether a broader cost-spreading scheme would have been wiser or more practical under the circumstances is not a question of constitutional dimension."

*Usery*, 428 U.S. at 18–19, 96 S.Ct. at 2894.

For the reasons stated above, defendant's and intervenor-defendant's cross-motions for summary judgment are granted, and the cause is ordered dismissed.